UNITED STATES of America, Plaintiff-Appellee,

v.

Neal T. ROBERTS and James Albert Robison, Defendants-Appellants.

Nos. 78–2738, 78–2806.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1979.*

Decided May 7, 1980.

Rehearing Denied July 3, 1980.

---

* This case was argued before the panel of Judges Hufstedler, Anderson and Wyatt. As a result of Judge Hufstedler's resignation, Judge Wright was substituted as a member of the panel.

John P. Otto, James H. Kemper, Derickson, Kemper & Henze, Phoenix, Ariz., argued, for defendants-appellants; Marvin Johnson, Phoenix, Ariz., on brief.

W. Ronald Jennings, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before WRIGHT and ANDERSON, Circuit Judges, and WYATT, Senior District Judge.**

WRIGHT, Circuit Judge.

Appellants Roberts and Robison argue that the prosecutor (1) improperly bolstered the credibility of its chief witness with his plea agreement to testify truthfully and (2) implied in closing argument that a state policeman corroborated that witness's testimony.

We reverse for improper closing argument.

## FACTS

Early one morning in January 1976, an unexploded bomb was discovered in a building used by the federal government.

Roberts and Robison were charged with the attempted bombing. The government contended that Roberts had recruited Robison and John Adamson to blow up the building.

The first trial resulted in a hung jury, but on retrial the jury returned guilty verdicts as to both Roberts and Robison.

Adamson was the government's chief witness. In exchange for his testimony in this case and three others, he received immunity from prosecution for 10 felonies and was allowed to plead guilty to a reduced charge of second degree murder. His plea agreement provided that he would lose these benefits "should he at any time testify untruthfully."

The entire plea agreement was admitted in evidence and, in closing argument, the prosecutor made devastating use of it. He told the jury that the critical issue was whether Adamson or Roberts was telling the truth, that Roberts could be expected to lie to save himself, but that Adamson would not lie for fear of violating his plea agreement and that a state police officer, Detective Sellers, was monitoring Adamson's testimony.

On appeal, appellants attack the introduction of the plea agreement, the prosecutor's use of it in closing argument, and his exploitation of Detective Sellers' presence at trial.

We hold the prosecutor committed reversible error by using Sellers' presence to argue for Adamson's credibility.

## CLOSING ARGUMENT

In his closing argument, the prosecutor's first theme was that the plea agreement, coupled with Sellers' supervision, made Adamson a credible witness. He declared:

Throughout the argument, ladies and gentlemen, there are two points which I would like you to consider. I would like

** Of the Southern District of New York.

you to think about these two points throughout the arguments . . . [of all counsel]: Either John Harvey Adamson when he testified two, two and a half days he was on the stand, either he lied when he gave his testimony or the defendant Neal Roberts lied when he gave his testimony. The testimony is open as to Roberts and Mr. Adamson. They are inconsistent. One of them has to be lying.

So you must ask yourselves who would have anything to gain by either lying or who would have anything to lose by lying. I suggest to you, ladies and gentlemen, that John Harvey Adamson had everything to lose by lying. I want you to read the plea agreement that is Government's Exhibit No. 1. I want you to read it from the first page to the last page. I want you to read it until you understand it.

In that plea agreement he has agreed to testify in four matters. He agreed to testify truthfully in all four of these matters. If he was caught lying as to material facts in any one of these matters, then his plea agreement would be called off. The charges of first-degree murder would be reinstated, and he would stand a very good likelihood of going to the gas chamber. If he would lose the bargaining power that he has, he has to serve a minimum of 20 years and two months instead of going to the gas chamber. This is what he stands to lose if he comes into this court or any other court that he has agreed to testify to and lie.

Detective Sellers has been pointed out throughout the trial as sitting in the courtroom during the testimony, particularly of John Harvey Adamson. I would suggest to you that Detective Sellers is not here on vacation. He had a mission to serve and that mission was to sit and listen to the testimony of John Harvey Adamson.

[DEFENSE COUNSEL]: If the Court please, there is no evidence of this, and I don't know if Mr. Sellers is here on vacation or not.

THE COURT: Yes, let's stay with the record.

[PROSECUTOR]: I submit to you, ladies and gentlemen, that he was here to listen to that testimony and make sure that—

[DEFENSE COUNSEL]: Object on the same grounds. It's the same. It's not in evidence.

[PROSECUTOR]: If Adamson lied, ladies and gentlemen, the plea agreement is called off.

We must examine the prosecutor's comments to determine (1) whether error was committed, (2) whether it was preserved for appeal and (3) whether the error was harmless.

### PROSECUTORIAL MISCONDUCT

We need not belabor the well-established principle that the prosecutor has a special obligation to avoid "improper suggestions, insinuations, and especially assertions of personal knowledge." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

■ It is improper for the prosecution to vouch for the credibility of a government witness. Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony. *Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958); *United States v. Lamerson*, 457 F.2d 371 (5th Cir. 1972).

The first type of vouching involves personal assurances of a witness's veracity and is not at issue here.

The second type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record. *See United States v. Garza*, 608 F.2d 659, 664 (5th Cir. 1979). It may occur more subtly than personal vouching, and is also more susceptible to abuse. This court has declared that such prosecutorial remarks may be fatal if:

> . . . the remarks, fairly construed, were based on the District Attorney's personal knowledge apart from the evi-

dence in the case and that the jury might have so understood them. *Orebo v. United States*, 293 F.2d 747, 749 (9th Cir. 1961).

The prosecutor in this case referred to evidence not in the record by declaring that Detective Sellers was monitoring Adamson's testimony.[1] The jury could naturally believe that Sellers had personal knowledge of relevant facts and was satisfied that these facts were accurately stated by Adamson. In effect, the prosecutor was telling the jury that another witness could have been called to support Adamson's testimony. This was error. *United States v. Morris*, 568 F.2d 396 (5th Cir. 1978) (improper to imply witness not called supports the prosecution), *Reichert v. United States*, 359 F.2d 278 (D.C. Cir. 1966) (improper to refer to witness's statements not introduced into evidence).

## PRESERVING THE ERROR FOR APPEAL

The error was preserved for appeal. Defense counsel properly objected to the prosecutor's reference to evidence outside the record. The objection was sustained but the prosecutor persisted with his argument.

It would have been helpful had defense counsel asked the trial court to give the jury a curative instruction, but such a request is not necessary when the error is brought to the court's attention and curative action is clearly called for. In *United States v. Berger*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934), Justice Sutherland declared:

> That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. . . .

The trial judge, it is true, sustained objections to some of the questions, insinuations and misstatements, and instructed the jury to disregard them. But the situation was one which called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial. It is impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken. *Berger v. United States*, 295 U.S. 78, 84–85, 55 S.Ct. 629, 632–633, 79 L.Ed. 1314 (1934).

Trial court judges are not mere referees. *Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948), (dissenting opinion); *United States v. Eldrid*, 588 F.2d 746, 749 (9th Cir. 1978). They play an active role, keeping the trial running efficiently with a minimum of error. Their control over closing argument is broad. *United States v. Sawyer*, 443 F.2d 712 (D.C. Cir. 1971)

A trial judge should be alert to deviations from proper argument. Because such comments have the clear potential for affecting adversely the defendant's right to a fair trial, the judge should take prompt corrective action as appropriate in each case. *See Viereck v. United States*, 318 U.S. 236, 247, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943).

Vouching for a government witness in closing argument has often been held to be plain error, reviewable even though no objection was raised. *See, e. g., United States v. Ludwig*, 508 F.2d 140 (10th Cir. 1974). *See also United States v. Carleo*, 576 F.2d 846 (10th Cir. 1978) (court raised objection *sua sponte*).

## HARMLESS ERROR

The error here may not be dismissed as harmless. The prosecutor did not limit him-

---

1. We reject the prosecutor's contention that his summation responded to comments made by defense counsel during Adamson's cross-examination and that it involved only proper inferences from evidence of Detective Sellers' presence introduced then. His comments were neither responsive nor appropriate. A prosecutor may naturally feel compelled to respond to the argument that criminals receiving favors from the government in exchange for their testimony are untrustworthy. We suggest that he might appropriately explain to the jury the necessity of using unsavory witnesses. *United States v. Armedo-Sarmiento*, 545 F.2d 785, 794 (2nd Cir. 1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

self to comments on the evidence. Under the standard of prejudice on the record as a whole, we cannot say the prosecutor's comments were harmless. The government did not have a strong case. *Compare, United States v. Giese*, 597 F.2d 1170, 1200 (9th Cir. 1979) (overwhelming evidence of guilt). Adamson was its chief witness and the prosecutor acknowledged that the government's case depended on his credibility.

We are not persuaded that the jury would have convicted the defendants had it not been exposed to improper argument. In similar circumstances, the Supreme Court concluded "prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Berger v. United States*, 295 U.S. at 89, 55 S.Ct. at 633.

### INTRODUCTION OF A PLEA *AGREEMENT CONTAINING A PROMISE OF TRUTHFULNESS*

In the event of a retrial, the district court may benefit from some guidance concerning the remaining two issues: introduction in evidence of the entire plea agreement and prosecutorial use of the promise to testify truthfully.

Adamson's plea agreement provided:

It is agreed by all parties that the defendant shall testify truthfully and completely at all times, whether under oath or not, to the crimes mentioned in this agreement. This shall include all interviews, depositions, hearings and trials. Should the defendant refuse to testify or should he at any time testify untruthfully or if any material fact in the defendant's transcribed statements given to the State prior to this agreement be false, then this entire agreement is null and void and the original charges will be automatically reinstated.

The issue here is not whether the agreement is admissible but whether Adamson's promise to testify truthfully should have been excised before the exhibit was presented to the jury.

■ Evidence that a witness is testifying pursuant to a plea agreement is usually admissible to show bias. *United States v.*

*Goodman*, 605 F.2d 870, 880 (5th Cir. 1979); *United States v. Antone*, 603 F.2d 566 (5th Cir. 1979). It, like other circumstantial evidence, may be rebutted by evidence of explanation. The plea agreement may be portrayed fully and placed in context so the jury is not misled about its terms or importance. *United States v. Rosson*, 441 F.2d 242, 244 (5th Cir. 1971), *cert. denied*, 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971).

■ Evidence is not admissible, however, simply because it is contained in or is offered to explain a plea agreement. References to irrelevant or prejudicial matters, for example, are often excluded. *See, e. g., United States v. Arroyo-Angulo*, 580 F.2d 1137, 1145 (2nd Cir. 1978) (fact that witness's family is in protective custody). Repetition of a prosecutor's assurance that a co-conspirator's guilty plea was wisely negotiated in light of the overwhelming evidence of guilt is similarly inadmissible. *United States v. Cochran*, 499 F.2d 380 (5th Cir. 1974).

### TREATMENT OF ISSUE IN OTHER CIRCUITS

Three circuits have addressed the question whether a plea agreement to testify truthfully is admissible.

The First Circuit has held that admitting a promise of truthfulness was not plain error. *United States v. Miceli*, 446 F.2d 256 (1st Cir. 1971). The *Miceli* opinion implies that the promise should not have been admitted over a proper objection, but the scope of the holding is unclear.

The Seventh Circuit has held that questioning the witness concerning a plea bargain promise of truthfulness was not vouching for the witness's credibility because it did not imply knowledge of facts outside the record. *United States v. Creamer*, 555 F.2d 612, 617–618 (7th Cir. 1977). The *Creamer* court seemed to say it is impossible for the promise to carry an improper suggestion.

The Second Circuit has held that a plea agreement containing a promise to testify truthfully is admissible on re-direct examination-

nation to rehabilitate a witness. *United States v. Koss*, 506 F.2d 1103, 1111, 1113 (2nd Cir. 1974). The *Koss* court declared that the evidence bore on credibility because the witness would lose his plea agreement immunity if he committed perjury, but cited no authority.

## THE TEST FOR ADMISSIBILITY

 The trial court has discretion to exclude evidence of bias. It must weigh the probative value of the evidence against its prejudicial impact and against the possibility the jury will use the evidence improperly. *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979). This test has been equated with the relevancy test performed under Rule 403 of the Federal Rules of Evidence. *Id.* We conclude this test applies equally to evidence offered to rehabilitate a witness who has been impeached for bias.

A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.

 Conveying this message explicitly is improper vouching. *Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958), *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir. 1972) (improper to imply government checks for credibility before using witness). We conclude that conveying it by implication is equally improper.

 A trial court should be alert to the problem of vouching before admitting a plea agreement containing a promise to testify truthfully. The court should consider the phrasing and content of the promise to ascertain its implications and decide whether an instruction to the jury would dispel any improper suggestions.

## USING THE PROMISE IN ARGUMENT

In addressing the third issue we consider the use which a prosecutor may make of a promise to testify truthfully once a plea agreement has been admitted.

 The prosecutor may not tell the jury that the government has confirmed a witness's credibility before using him. *Gradsky v. United States, supra.* He should be no more able to indicate that the government has taken steps to compel the witness to be truthful. Both of these arguments involve improper vouching because they invite the jury to rely on the government's assessment that the witness is testifying truthfully.

 As Judge Friendly declared, prosecutorial remarks implying that the government is motivating the witness to testify truthfully:

. . . are prosecutorial overkill. They inevitably give jurors the impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the latter is not stretching the facts—something the prosecutor usually is quite unable to do; . . . If proper objection had been made to the summation, the judge should have sustained it; if matters had gone too far to make a striking of the remarks an effective cure, the judge should have instructed that the promise in the cooperation agreement adds little to the truth-telling obligation imposed by the oath; that the prosecutor often has no way of knowing whether the witness is telling the truth or not; that the books are not filled with perjury indictments of Government witnesses who have gone beyond the facts; and that an acquittal would not mean that as a matter of course the Government would seek such an indictment or even fail to make its promised recommendation of leniency. If prosecutors know that such instructions will be given, they will hardly be tempted to the excesses committed here.

*United States v. Arroyo-Angulo*, 580 F.2d 1137, 1150 (2nd Cir. 1978) (concurring opin-

ion). We agree. The prosecution may not portray itself as a guarantor of truthfulness.

Several other circuits have held that the test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility. *See e. g., United States v. Bess*, 593 F.2d 749, 756–57 (6th Cir. 1979), *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977). This court expressed the same idea in *Orebo v. United States*, 293 F.2d 747, 749 (9th Cir. 1961).

*JURISDICTION*

Judge Wyatt argues that we cannot reach the merits of this appeal because the appellants have not been validly sentenced. We disagree.

This case was transferred from the District of Arizona to the Southern District of California for trial. Arizona judges presided over the trial in Southern California but sentenced the defendants in an Arizona courtroom, using forms headed The District of Arizona.

The dissent would establish that (1) Rule 21, Federal Rules Criminal Procedure, requires transfer of the entire prosecution and (2) subject matter jurisdiction is transferred to the new court. Both propositions are essential to the conclusion that the sentence of the transferor court is void because it had relinquished subject matter jurisdiction entirely.

Subject matter jurisdiction, also called jurisdiction over the subject matter, refers to the types of cases a court is authorized to hear. It is not transferable.

Every federal district court has jurisdiction over the subject matter of this case:

The district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States.

18 U.S.C. § 3231.

■ Rule 21 provides for change of venue. A criminal defendant has a constitutional right to be tried in the jurisdiction where the crime was committed. This "constitutional venue" right, like other venue rights, can be waived. *United States v. Powell*, 498 F.2d 890, 891 (9th Cir. 1974).

Occasionally courts speak in terms of jurisdiction when they mean venue. *See* 15 Wright, Miller & Cooper, Federal Practice and Procedure, § 3801 (discussing civil venue). This imprecision unfortunately causes confusion, but it does not convert venue problems into problems involving subject matter jurisdiction.

Assuming Judge Wyatt is correct that the transferor court cannot transfer the trial and retain authority to impose sentence, the appellants should have been sentenced in the transferee court. Neither the appellants nor the prosecution objected, however, so they waived their venue rights.

■ This court must reach the merits of the case because we have no basis to hold that the sentence imposed was void.

*REVERSED.*

J. BLAINE ANDERSON, Circuit Judge, specially concurring:

I concur in Judge Wright's opinion reversing the convictions. I write a special concurrence merely to comment on the question concerning the transfer of these cases between the two districts.

In reviewing these cases, we noted the possibility of irregularities in the transfer of these cases between the districts and in the taking of the appeal. We thus requested counsel to supplement their briefs to consider this matter, as it had not been raised by either party.

After considering the record and the briefs of counsel, I believe that the defects and irregularities in the proceedings below did not affect any substantial rights of the defendants, and reversal of their convictions is not required on that ground. F.R. Crim.Pr.Rule 52(a). Defendants do not contend, and on this record could not seriously contend, that any substantial right of theirs had been affected in any degree by the procedural irregularities.

Under the 6th amendment, a criminal defendant has the right to be tried in the

jurisdiction where the crime was committed. That right is a venue provision and, though it is a constitutional right, it may be waived. *U. S. v. Jercha*, 458 F.2d 1340 (9th Cir. 1972); see also *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

Under F.Crim.Pr.Rule 21, a formal procedure for waiving "constitutional venue" has been promulgated. Rule 21 allows a change of venue under two circumstances:

a) where the court is satisfied that prejudice is so great that the defendant could not obtain a fair and impartial trial in that district;

b) where, for the convenience of the parties and in the interest of justice, the court believes that the case should be transferred.

In both instances, transfer to another district will be considered by the transferor court only upon a *motion by the defendant* for a change of venue. It is a defendant's waiver of the "constitutional venue" right that allows a change of venue.

Rule 21(c) sets out the procedures for transfer of cases. It provides that:

"When a transfer is ordered the clerk shall transmit to the clerk of the court to which the proceeding is transferred all papers in the proceeding or duplicates thereof and any bail taken, and the prosecution shall continue in that district."

The transfer of a case from one district to another is a venue question, but jurisdiction is also involved. A change of venue results in both jurisdiction and venue being given over to the transferee court.

In the present cases, the transmittal of all the papers was not accomplished as required by Rule 21(c). However, I agree with Judge Wyatt that "[the] failure [of] the Clerk in Phoenix to transmit the papers to the Clerk in San Diego did not prevent the transfer of jurisdiction over this indictment to the District Court for the Southern District of California." (Judge Wyatt's dissent at p. 546) Further, the judges from the District of Arizona secured designations to sit in the Southern District of California. "Thus when the trials were held in San Diego the trial was by and before the United States District Court for the Southern District of California."

Judge Wyatt also states, and I agree, that although certain trial papers were captioned and filed in the District of Arizona and were not captioned and filed in the Southern District of California, that "these errors do not affect the realty: the trial was before a court having jurisdiction of the indictment, before a judge properly designated to hold that court, before a jury properly summoned and selected, at a place within the district of the district court conducting the trial."

The errors in failing to transmit and in filing and captioning the papers in the wrong court were errors under Rule 52(a) which did not affect substantial rights of the defendants and which therefore do not require reversal.

Judge Wyatt states that the cases should be reversed, however, because of problems in the proceedings following the jury verdict in San Diego. He states, on page 547 of his dissent, that:

"Had the further proceedings after verdict been conducted in Arizona by the District Judges for the District of Arizona acting under their designations as representatives of the District Court for the Southern District of California, and had judgment of conviction been . . . entered by the Clerk of that Court, a different problem would be presented at this stage of the matter. But that was not the course of events.

"Once the jury verdict was received, the indictment proceeding was treated as if the transfer of jurisdiction to the Southern District of California had never been made. The prosecution continued exclusively in the District Court for the District of Arizona.

"The sentences were imposed by, and the judgments of conviction were entered in, the District Court for the District of Arizona. The conclusion is inescapable for me that the District Court for the District of Arizona had no jurisdiction to impose the sentences or to enter the judg-

ments from which these appeals are taken."

I respectfully disagree with the conclusions reached by Judge Wyatt. I believe the proceedings after the verdict can be viewed in two different ways, either of which would not require reversal.

Once the jury verdict was received, the purpose of the transfer to the Southern District of California had been accomplished: the defendants had been given the opportunity to be tried in a district other than where the prejudice was so great that they could not have received a fair trial. After the receipt of the jury verdict, the parties agreed to return to Arizona for sentencing. It was freely and voluntarily done for the convenience of all concerned.

If jurisdiction is deemed to have remained in the District Court for the Southern District of California, I would view the District Judges for the District of Arizona to have acted under their continued designations as representatives of the District Court for the Southern District of California. The defendants agreed to return to the District of Arizona for sentencing, and, therefore, waived any right to be sentenced in San Diego.

We may also view the defendants' agreement to return to the District of Arizona as a waiver of venue. This waiver, though not made pursuant to any procedural rule, now prevents the defendants from asserting that they should have been sentenced in the District Court for the Southern District of California. The waiver, for the convenience of all concerned, effectively transferred the venue of the case back to the District Court for the District of Arizona which then had "jurisdiction" (venue) to sentence the defendants.

Under either view, any irregularities concerning the filing of papers or the transferring of the sentencing back to Arizona without mere formal motions and orders, I would view were harmless as the procedural irregularities did not affect any substantial rights of the defendants.

WYATT, District Judge (dissenting):

With regret and with great respect for the views of the majority, I must dissent from the decision expressed in Judge Wright's opinion. My disagreement is due to a belief that the District Court which entered the judgments of conviction had no jurisdiction to do so and that "we have jurisdiction on appeal, *not of the merits* but merely for the purpose of correcting the error of the lower court in entertaining the suit". *United States v. Corrick*, 298 U.S. 435, 440, 56 S.Ct. 829, 832, 80 L.Ed. 1263 (1936) (emphasis supplied). To the same effect is a criminal case in this Court, *Russell v. United States*, 306 F.2d 402, 405 (9th Cir. 1962) I would reverse for want of jurisdiction of the District Court. Therefore, I do not reach the merits and am unable to join in the majority opinion reversing on the merits.

1.

The appeals to this Court are from judgments of conviction entered on July 24, 1978, in the United States District Court for the District of Arizona, after sentences imposed at Phoenix by that Court. Jurisdiction over the indictment, however, had on May 2, 1977, been transferred to the United States District Court for the Southern District of California under Rule 21 of the Federal Rules of Criminal Procedure. The indictment has been pending under the jurisdiction of the District Court for the Southern District of California since May 2, 1977, and is pending there now. The trial was held in the Southern District of California. Sentence should have been imposed in that District by the District Court for that District. Instead, through a series of what seem to me serious errors everything except the trial took place in the District Court for the District of Arizona, which, having transferred the indictment to another District, was without any jurisdiction over its prosecution.

2.

The indictment against the two appellants was returned by a grand jury at Phoenix in the District of Arizona on March 2, 1977. Roberts and Robison are named in

the first four counts; Robison alone is named in the fifth count. The indictment was assigned to Judge Copple.

On April 18, 1977, defendant Robison filed a motion for a transfer from the District of Arizona "for purposes of conducting a trial." The motion was said to be made under Fed.R.Crim.P. 21. An accompanying memorandum explained that Robison was charged in two criminal cases in the Arizona state court; that one of these was then on trial; and that the other was awaiting trial. It appeared that one of the state cases charged the murder of Don Bolles, an investigative reporter for a Phoenix newspaper, which was a nationally sensational news story, in and after June 1976. Robison relied on Rule 21(a) which provides for transfer of the proceedings where prejudice is so great that the defendant "cannot obtain a fair and impartial trial at any place fixed by law for holding court" in the district where the indictment was returned. Robison urged that he could not obtain a fair trial in the District of Arizona because of "massive publicity in the newspapers and on the television and radio stations of this district".

On April 21, 1977, the Government filed its response to the motion for a transfer. The Government stated it was "well aware of the publicity" and took no position as to whether "venue in this matter should be changed" (R. 136).

Nothing was filed for defendant Roberts on the motion to transfer.

The motion for a transfer was heard by Judge Copple on April 25, 1977. Counsel for movant Robison emphasized that prejudicial publicity had increased since the motion was made. Counsel for Roberts stated that he "strenuously objects to any change of venue in this matter". At the end of the hearing, Judge Copple orally decided that the "motion for change of venue solely on behalf of Robison is denied at this time".

On Friday, April 29, 1977, defendant Robison submitted a "Motion Re-Urging Defendant Robison's Previous Motion for Continuance and Change of Venue". This was apparently hand carried to Judge Copple, to counsel for Roberts, and to the Government. This second motion asked "for transfer from the District of Arizona". The motion contained this paragraph (R. 138; "R" references are to pages of the Record on Appeal; emphasis supplied):

"Counsel for Co-Defendant Roberts has furthermore withdrawn opposition to this counsel's previous motion to transfer *this prosecution* outside of the District of Arizona."

Something must have been submitted at this time by Roberts because the docket shows that on Monday, May 2, 1977, there was filed "Joinder in motions for change of venue and for continuance by deft. Roberts". This must have been submitted to Judge Copple on Friday, April 29; the document is not part of the Record.

On April 29, 1977, Judge Copple signed an order which, in relevant part, is as follows:

"Pursuant to Rule 21(a) and (b) Fed.R. Cr.P. this case is transferred for trial to the Southern District of California at San Diego, California."

This order was filed on May 2, 1977.

There is nothing in the Record to show that either appellant ever made a motion under Rule 21(b), which relates to "the convenience of parties and witnesses". Since a motion by defendant is essential for the grant of an order of transfer under Rule 21 (because a defendant has a constitutional right to a trial in the district where the offense was committed) (*United States v. Angiulo*, 497 F.2d 440, 441 (1st Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974); Original Committee Note to Fed.R.Crim.P. 21(a) and (b), Par. No. 3), there is nothing in writing in this record which would authorize a transfer under Rule 21(b). The only motion in the written record is under Rule 21(a), a transfer for prejudice, not for convenience. Moreover, as to convenience, Phoenix would clearly have been more convenient than San Diego.

The order of transfer states that "this case is transferred for trial". This wording does not conform to the provisions of Rule

21(a), which directs that the Court "shall transfer the *proceeding*" (emphasis supplied) and does not conform to the provisions of Rule 21(b) which provides that the Court "may transfer the *proceeding*" (emphasis supplied). On the other hand, the wording does conform to the title of Rule 21, which is "Transfer from the District for Trial".

### 3.

The full text of Rule 21 is as follows:

*RULE 21. Transfer from the District for Trial*

(a) *For Prejudice in the District.* The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

(b) *Transfer in Other Cases.* For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district.

(c) *Proceedings on Transfer.* When a transfer is ordered the clerk shall transmit to the clerk of the court to which the proceeding is transferred all papers in the proceedings or duplicates thereof and any bail taken, and the prosecution shall continue in that district.

Rule 21(c) states the procedure to be followed after a transfer has been ordered. The clerk of the transferor court must transmit to the clerk of the transferee court "all papers in the proceeding" and "any bail taken". A further direction is explicit: "the prosecution shall continue in that district", namely, the *transferee* district. Rule 21(c) thus contemplates that after an order of transfer the *transferor court* is to have nothing further to do with the proceeding, that the transferor court is without jurisdiction over it, and that everything to final judgment will take place in the transferee court, which has exclusive jurisdiction over the proceeding. Of course, a *judge* of the transferor court, if properly designated under 28 U.S.C. § 292, can conduct any and all steps in the indictment proceeding, including the trial. Should this be done, however, the judge acts as a representative of the *transferee* court and his authority so to act derives from his designation under the statute cited.

Rule 21 provides only *one* kind of transfer, a transfer of the *entire* "proceeding", and, as seen, it directs that after transfer "the prosecution shall continue" in the transferee court. There is no authority in Rule 21 for a transfer *solely* of the trial, with the transferor court retaining jurisdiction over the proceeding and with the indictment to remain pending in the transferor court. The majority, however, emphasizes that the indictment was by the terms of the order transferred to the Southern District of California "for trial". The majority then accepts the notion that under Rule 21 an indictment can be transferred to another district "for trial" only and can remain pending for all other purposes in the district in which the indictment was returned. This is dead against the plain language of Rule 21 and thus against the command of Congress, the authority of which is the underpinning of all the Criminal Rules (18 U.S.C. §§ 3771, 3772).

In view of the clear directions in Rule 21, it is not surprising that, according to my research, every reported case involving a transfer under Rule 21 shows continuance of the prosecution after transfer in the transferee court, sentence in the transferee court after conviction, entry of judgment in the transferee court, and appeal from the judgment of the transferee court. Examples of this procedure prescribed by Rule 21 are *United States v. Crow Dog*, 532 F.2d 1182 (8th Cir. 1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Angiulo*, 497 F.2d 440 (1st Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974); *United States v. Wilson*, 436 F.2d 122 (3d Cir.), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 654

(1971); *United States v. Marcello*, 423 F.2d 993 (5th Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543, *rehearing denied*, 399 U.S. 938, 90 S.Ct. 2240, 26 L.Ed.2d 809 (1970); *Ashe v. United States*, 288 F.2d 725, 731 (6th Cir. 1961); *United States v. DeMarco*, 407 F.Supp. 107 (C.D.Cal.1975).

It thus seems clear that when a transfer of an indictment proceeding under Rule 21(a) or (b) is made, the transferor court loses jurisdiction of the proceeding and the transferee court obtains jurisdiction over that proceeding. The examples cited under Rule 21 illustrate this.

There is another provision under the Criminal Rules for transfer from the district of an indictment.

Rule 20(a) of the Federal Rules of Criminal Procedure provides for a transfer of an indictment where a defendant, "arrested, held or present" in another district, wishes to plead guilty in that district where he has been arrested or is held or is present. Rule 20(a) does not state that an *order* of transfer must be made but otherwise it contains language very similar to Rule 21(c), namely, that "the clerk of the court [for the district] in which the indictment . . . is pending shall transmit the papers in the proceeding or certified copies thereof to the clerk of the court for the district in which the defendant is arrested, held, or present, and the prosecution shall continue in that district." Rule 20(c) then provides for the situation where an indictment has been transferred under Rule 20(a) so that a defendant may plead guilty but where for some reason the defendant pleads not guilty. In that situation, Rule 20(c) directs that "the clerk shall return the papers to the court in which the prosecution commenced, and the proceeding shall be restored to the docket of that court."

The reported decisions hold or recognize that where an indictment is transferred under Rule 20, the transferor court loses jurisdiction and the transferee court acquires exclusive jurisdiction of the indictment proceeding. Examples are *Warren v. Richardson*, 333 F.2d 781, 783 (9th Cir. 1964); *Perry v. United States*, 432 F.Supp. 645, 648–49

(M.D.Fla.1977); *United States v. Binion*, 107 F.Supp. 680 (D.Nev.1952).

The case at bar is the first and only instance (so far as I can find) where, after transfer of an indictment to another district, the transferor court continued to exercise jurisdiction over the proceeding.

4.

Having on May 2, 1977, ordered the proceeding transferred under Rule 21 to the Southern District of California, the District Court for the District of Arizona then disregarded completely the instructions contained in Rule 21(c). The Clerk in Phoenix did not transfer "all papers" and "any bail taken" to the Clerk in San Diego, as Rule 21(c) directs. The "prosecution" did not "continue" in the Southern District of California, as Rule 21(c) directs. The papers remained in Arizona, docket entries continued to be made in Arizona, all documents continued to be captioned in the District of Arizona and to be filed there, and all hearings took place in Arizona. So far as appears, the District Court for the Southern District of California was never advised that the indictment at bar had been transferred to its jurisdiction.

5.

The first trial began on February 7, 1978, in San Diego before Judge Copple and a jury; apparently the jury had been summoned by the District Court for the Southern District of California. Arrangements must have been made to use the physical facilities in San Diego of the District Court for the Southern District of California, and its jury summoning mechanism. The courtroom staff—deputy clerk, reporter and marshals—were from the District of Arizona. Judge Copple had been properly designated by Chief Judge Browning to hold a district court in the Southern District of California (28 U.S.C. § 292(b)).

The first trial took place on February 7, 8, 9, 10 (Friday), 13 (Monday), 14, 15, 16, 17 (Friday), 21 (Tuesday); February 20 was a holiday (Washington's Birthday). The case was submitted to the jury on Wednesday, February 15. The jury was given typed

and printed forms for the return of written and signed verdicts a separate form for each defendant; that for Roberts was captioned in the "United States District Court for the Southern District of California"; that for Robison was captioned in the "United States District Court for the Southern District of Arizona". After deliberating during the days until the morning of Friday, February 17, 1978, the jury then returned written and signed verdicts of guilty on all counts as to the two defendants. When the jury was polled, however, the Foreman declined to agree to the verdict as to Roberts. The jury was instructed to resume its deliberations and did so until Tuesday morning, February 21, when the jury reported that it was unable to reach a unanimous verdict. A mistrial was then declared as to both defendants on the agreement of all counsel.

The second trial began in San Diego on May 2, 1978, before Judge Copple and a jury. The trial continued on May 3 and on May 4. On Monday, May 8, Judge Copple met with counsel and, under Rule 25(a), stated in substance that he was unable to proceed with the trial and that Judge Craig (also of the District of Arizona) would proceed with and finish the trial. Counsel for Roberts and for the Government made no objection and agreed to this change, but counsel for Robison moved for a mistrial so that there could be "another trial", before "another jury", and before "another judge . . . so the matter may be fully heard by a judge who has had an opportunity fully to examine the record and make himself aware of all the circumstances involved in this trial". The motion for a mistrial was denied by Judge Copple.

The second trial resumed on May 9 before Judge Craig who made a statement on the record which satisfied the requirement of Rule 25(a) of "certifying that he has familiarized himself with the record of the trial". Judge Craig was properly designated by Chief Judge Browning to hold a district court in the Southern District of California (28 U.S.C. § 292(b)).

The trial continued before Judge Craig on May 9, 10, 11, 12, and 15. On Monday, May 15, the trial at San Diego was adjourned to Tuesday morning, May 23, because of a Judicial Conference in Phoenix the rest of that week. The trial resumed on May 23 and final arguments of counsel were heard. On the morning of Wednesday, May 24, the Court charged the jury. The jury was requested to return its verdict as to each defendant on a written form given to the jury captioned in the "United States District Court for the District of Arizona". The jury retired to deliberate at 10:35 a. m. At 3:05 p. m. on the same day the jury returned its written verdicts finding each defendant guilty on each count naming him.

After the verdict was accepted by Judge Craig, he set June 26, 1978, in Courtroom No. 1 at Phoenix, Arizona at 2:00 p. m. as the time and place of sentence. Nothing is said, according to the transcript, as to the judge who would impose sentence. The docket entry states that sentence will be "before Hon. W. E. Craig at Phx.".

Between verdict and sentencing, both Judge Craig and Judge Copple made rulings and orders in the case.

On June 7, 1978, an order was filed by Judge Copple denying a request of Robison to address interrogatories to the trial jurors. It is recited that the order is made "with the concurrence of Judge Craig who presided over a portion of the case."

The docket contains an entry that on June 9 Judge Copple filed an order adjourning the sentences from June 26, to July 17.

On June 12 counsel for Roberts filed two motions, one for a new trial and one for judgment of acquittal. Both motions contained in the caption this statement: "Assigned to the Honorable Walter E. Craig for Post-Trial Hearing". By whom the assignment was made does not appear.

On June 15 Robison filed a motion for a new trial.

The docket contains an entry that on July 6 an order was filed adjourning the sentences from July 17 to July 24. This is said

to be because the post-trial motions will be heard by Judge Craig on July 17 and must be ruled on before sentencing. The judge making the order is not given, but presumably it was Judge Copple.

There is a transcript of a hearing in Prescott, Arizona, on July 17 of motions by defendants for new trials, etc. While it is not expressly stated, this was evidently before Judge Craig who, at the end of the hearing, denied the motions.

The sentences were imposed at Phoenix by Judge Copple on July 24, 1978.

The judgments of conviction, signed by Judge Copple were filed on the same date in the office of the Clerk of the District Court for the District of Arizona.

Notices of appeal were timely filed with the Clerk of the District of Arizona.

Thus the matter reaches this Court on appeals from judgments of the District Court for the District of Arizona. That court, by order filed May 2, 1977, had transferred the proceeding to the District Court for the Southern District of California, which thereafter, in my view, had exclusive jurisdiction over the proceedings. The District Court for the District of Arizona had no jurisdiction to make the judgments from which these appeals are taken.

### 6.

It might at least be questioned whether the failure of the Clerk at Phoenix to transmit all papers to the Clerk at San Diego prevented the transfer of jurisdiction to the District Court at San Diego.

The direction in Rule 21(c) to the Clerk to transmit all papers to the transferee court seems purely administrative in nature, designed to make it practicable for the prosecution to continue in the transferee district. There is nothing to suggest that failure of transmittal would deprive the transferee court of jurisdiction. That neglect or refusal by the Clerk should nullify an order of transfer would be to place form over substance.

No reported decision has been found in which this point is discussed. This is doubtless because the case at bar seems to be the first instance where the instructions of Rule 21(c) have not been followed.

There is a provision for the transfer of *civil* actions which is somewhat comparable to Rule 21. The provision is 28 U.S.C. § 1404(a), authorizing discretionary transfer of a civil action for "the convenience of parties and witnesses, in the interest of justice". That provision contains nothing, however, about any transmittal of papers to the transferee district. It seems to be assumed that, if transfer is ordered, transmittal will follow.

There are, of course, many more civil actions than criminal cases and many more orders transferring civil actions to other districts. In consequence, there have been many attempts to secure Court of Appeals review of orders transferring civil actions.

It has long been recognized that if the filing of an order of transfer ends the jurisdiction of the transferor court over a civil action, then it is difficult to secure review of that order in the Circuit of the transferor court. Evidently with the design to remedy that difficulty and to permit review of orders transferring civil actions, Judge Learned Hand treated transmittal of the papers in civil actions as the symbolic act of transfer and if this were delayed by the transferor court a petition for mandamus might be filed or an appeal taken (which, being interlocutory, could not survive, but might be treated as a petition for mandamus). This was the situation in *Magnetic Eng. & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866 (2d Cir. 1950). The District Court had filed an order transferring an action from the Southern District of New York to the Eastern District of Wisconsin. The Clerk did not at once transmit the papers but, at the direction of the judge, delayed transmittal. Plaintiff appealed from the order granting the motion to transfer. Thereafter the Clerk transmitted the papers to the Eastern District of Wisconsin. Judge Learned Hand stated (178 F.2d at 868):

The order did not affect automatically to transfer the cause; the transmittal of the papers was to be the symbolic act of

transfer; and the case was still in the district court, when the appeal was taken. Since the appeal removed it, nothing taking place later in the district court could affect the jurisdiction once acquired.

The court then decided that since it was interlocutory the order of transfer was not appealable, but that if the appeal were dismissed it would be too late for plaintiff to petition for mandamus since the district court had lost jurisdiction by transmittal of the papers to the Eastern District of Wisconsin. Judge Hand continued (178 F.2d at 869):

. . . if we dismiss the appeal and remand the case to the district court it will be too late to grant a mandamus, for the cause has already been transferred. Nevertheless, if we should have had jurisdiction to issue the writ, had the plaintiff applied for it at the time when it appealed, we think that we ought to grant it now, ignoring what is at best only a matter of form; and for that reason we hold that we are free to treat the appeal as a petition for mandamus.

A motion for reargument was made in a transferor district court *after* an order of transfer had been filed and *after* the papers had been transmitted. There was then a petition for mandamus to review the order of transfer. The Second Circuit Court of Appeals declared: "Thus, when that motion [for reargument] came on to be heard the District Court for the Southern District of New York had already lost all jurisdiction over the action because the transfer was then complete." *Drabik v. Murphy*, 246 F.2d 408, 409 (2d Cir. 1957; L. Hand, C. J.).

The Supreme Court, however, has cast considerable doubt on the significance of transmittal to, or receipt by, the transferee court of papers when determining the effective time of a transfer of jurisdiction over a civil action. In *Koehring Co. v. Hyde Construction Co.*, 382 U.S. 362, 86 S.Ct. 522, 15 L.Ed.2d 416 (1966), the Supreme Court decided that the transferee court acquires jurisdiction, at least in some instances, *before* receipt of papers from the transferor Court. On March 10, 1964, the Fifth Circuit Court of Appeals ordered an action transferred to a District in Oklahoma. The order provided that "pending the entry of the order of transfer by the District Judge and the physical filing of the record in Oklahoma, this order shall constitute a transfer to enable the parties to present the matter to the District Court of Oklahoma." On March 11, 1964—*before* the papers had been transmitted from Mississippi—the District Court in Oklahoma issued a restraining order in the action and later issued an injunction, and entered a judgment of civil contempt. The Tenth Circuit Court of Appeals reversed the injunction and the contempt judgment on the ground that the District Court in Oklahoma had not acquired jurisdiction on March 11, 1964 when it issued its order. 348 F.2d 643 at 648. The Tenth Circuit, relying in part on *Drabik v. Murphy*, above cited, held that the transferee court lacked jurisdiction "since the transfer of the papers, etc. to the transferee court is considered essential to that Court's acquiring jurisdiction." (348 F.2d at 648.) The Supreme Court summarily reversed, saying (382 U.S. at 364–5, 86 S.Ct. at 524):

"In the special circumstances of this case, we conclude that the District Court in Oklahoma had acquired jurisdiction on March 11 in accordance with the Fifth Circuit's order for *instanter* transfer and that the Tenth Circuit erred in vacating the District Court's orders on the stated jurisdictional ground."

Footnote 4 to the Supreme Court's per curiam opinion read as follows:

"*Drabik v. Murphy*, 246 F.2d 408 (C.A.2d Cir.), is not authority for the proposition that the transferee court fails to acquire jurisdiction until papers are received from the transferor court. On the contrary, *Drabik* suggests that the transferor court may lose jurisdiction before that event."

Professor Wright, in Law of Federal Courts (3d ed.) 187, says with reference to the transfer of a civil action:

"Once the motion has been granted and the papers lodged with the transferee

Court, the transferor Court loses all jurisdiction over the case."

This same sentence was in the first edition of the treatise in 1963 and, of course, does not explicitly preclude loss by the transferor court of jurisdiction over a civil action at some earlier time. Moreover, the third edition (in 1976) has this footnote to the sentence, citing as authority the Supreme Court decision in *Koehring* (emphasis supplied):

"But the transferee court may acquire jurisdiction *before* the papers have physically reached it."

It is concluded that failure by the Clerk in Phoenix to transmit the papers to the Clerk in San Diego did not prevent transfer of jurisdiction over this indictment to the District Court for the Southern District of California. Evidently, the judges in the District of Arizona believed that the transfer of jurisdiction had been completed, else they would not have secured designations to sit in San Diego and would not have conducted the trials there.

The situation after an order of transfer is summed up by American Jurisprudence 2d, under "Criminal Law" and under "Transfer of Causes in Federal Courts", in the following statement (21 Am.Jur.2d, 440):

On transferring a cause, the court in which the action was originally commenced loses jurisdiction, and the court to which the proceeding is transferred has and exercises over the matter the same jurisdiction as if it had been originally commenced in the district.

7.

The authority and justification for holding the trial in San Diego is entirely that the proceeding had been transferred from the *jurisdiction* of the District Court for the District of Arizona to the *jurisdiction* of the District Court for the Southern District of California.

The District Court for the District of Arizona cannot hold court and conduct trials in San Diego but *only* within the District of Arizona at four places therein. The command of Congress is explicit: "Arizona constitutes one judicial district. Court shall be held at Globe, Phoenix, Prescott and Tucson". (28 U.S.C. § 82). In creating the district courts, Congress provided (28 U.S.C. § 132): "There shall be in each judicial district a district court . . ." and "the judicial power of a district court . . . may be exercised by a single judge . . .". This last provision should be noticed; it is fundamental that a district judge has no judicial power individually; his judicial power is exercised as the representative of a *court*. "[J]urisdiction is lodged in a court, not in a person. The judge, exercising the jurisdiction, acts for the court". *In re Brown*, 346 F.2d 903, 910 (5th Cir. 1965), quoted with approval in *United States v. Teresi*, 484 F.2d 894, 898 (7th Cir. 1973). That district courts may act only within their respective districts seems self-evident and has been assumed since the Judiciary Act of 1789. Congress, however, has not hesitated to make it emphatic. For example, Congress has provided for the times of regular sessions of the district court "for transacting judicial business *at the places fixed by this chapter*" (28 U.S.C. § 139) (emphasis supplied), for adjournment of any regular session "by order made anywhere *within its district*" (28 U.S.C. § 140) (emphasis supplied), and for special sessions of the court "at such places *in the district* as the nature of the business may require" (28 U.S.C. § 141) (emphasis supplied). The Supreme Court has said: "District Courts are solely the creation of statute, and the place in which a judge thereof may exercise jurisdiction is subject absolutely to the control of Congress". *McDowell v. United States*, 159 U.S. 596, 598–9, 16 S.Ct. 111, 111–112, 40 L.Ed. 271 (1895)

Thus, when the trials were held in San Diego, the trial was by and before the United States District Court for the Southern District of California. Judge Copple and Judge Craig were acting as representatives of that Court and their authority so to act derived from their designation by Chief Judge Browning under 28 U.S.C. § 292(b) to hold "a district court in the Southern District of California". It seems self-evident

that the court they held in San Diego, and the only court they could have held there, was the United States District Court for the Southern District of California. It was not, and could not have been, the United States District Court for the District of Arizona. It is true that the stenographic transcript of the second trial is captioned in the District of Arizona, that the jury verdict forms are similarly so captioned, and that all other papers incident to the trial are so captioned. They were all filed in the District Court for the District of Arizona; nothing was filed in the District Court for the Southern District of California. These were all errors, in my view, and as the Government now seems to concede (Supplemental Brief, p. 9). But these errors do not affect the reality: the trial was in the District Court for the Southern District of California, such court had jurisdiction of the indictment, before a judge properly designated to act as representative of that court, before a jury properly summoned and selected in that court, and at a place within the district of that court. The Government recognizes this reality (Supplemental Brief, p. 9): "The verdicts in the second case were received in the District Court for the Southern District of California . . .".

8.

The trial in the Southern District of California was not concluded by the return of the jury verdict. "A criminal trial is concluded by the judgment of sentence entered upon a plea or a verdict of guilt". *Frad v. Kelly*, 302 U.S. 312, 317, 58 S.Ct. 188, 191, 82 L.Ed. 282 (1937). The appropriate course of the proceedings, after receipt of the jury verdict, would have been (as I see it) for Judge Craig to have finished the trial to judgment in the Southern District of California. Having been substituted for Judge Copple under Rule 25(a), it would be expected that the substitute judge would "finish the trial", to use the words of Rule 25(a). According to Rule 25(b), there could be a further substitution after verdict if there was some "disability" on the part of Judge Craig, but no such "disability" is made to appear.

Had the further proceedings after verdict been conducted in Arizona by the District Judges for the District of Arizona acting under their designations as representatives of the District Court for the Southern District of California, and had the judgments of conviction been in the name of the District Court for the Southern District of California and filed with and entered by the Clerk of that Court, a different problem would be presented at this stage of the matter. But that was not to be the course of events.

Once the jury verdict was received, the indictment proceeding was treated as if the transfer of jurisdiction to the Southern District of California had never been made. The prosecution continued exclusively in the District Court for the District of Arizona.

The sentences were imposed by, and the judgments of conviction were entered in, the District Court for the District of Arizona. The conclusion is inescapable for me that the District Court for the District of Arizona had no jurisdiction to impose the sentences or to enter the judgments from which these appeals are taken.

9.

The majority treats the problem here as entirely one of venue and invokes the established principle (fully accepted by me) that a venue defect in a criminal proceeding (as in a civil action) may be waived by a defendant. The problem at bar, however, is not whether a proceeding, pending in a court where the venue was wrong, could nevertheless properly proceed to judgment in that court on the basis of a waiver by defendants of their right to object to the improper venue. The problem at bar is whether, after May 2, 1977, the District Court for the District of Arizona had any authority over the specific indictment against Roberts and Robison. That specific indictment, having been transferred to the Southern District of California, was no longer pending in the District of Arizona at the time of sentence. The judgments on appeal were null and void because the indictment on which they were based was not

pending in the court which made the judgments. There certainly must be an indictment pending in the Court before the Court is authorized to act on it. Such is not only clear on the face of things but is spelled out by the plain provision in Rule 7(a) of the Criminal Rules that the offenses charged against Roberts and Robison, as with all felony offenses, "shall be prosecuted by indictment."

The difference between the problem as seen by the majority and the problem as I see it may be illustrated by contrasting *United States v. Powell*, 498 F.2d 890, 891 (9th Cir. 1974), with *United States v. Macklin*, 523 F.2d 193 (2d Cir. 1975).

Powell was indicted in the Southern District of California for transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2). The Sixth Amendment and Criminal Rule 18 require that prosecution of an offense be in the district where the offense was committed. No objection to venue was raised by Powell until after the jury's verdict of guilty. Then on appeal he urged that venue in the Southern District of California had not been established, pointing out that his vehicle had been stopped and the illegal aliens discovered in the Central District of California. This Court affirmed the conviction, stating, among other things: "We note at the outset that venue, since it may be waived, is not an essential fact constituting the offense charged." (498 F.2d at 891.) I agree entirely with the statement and with the decision. The point of significance in *Powell* for our purpose is that a valid indictment against Powell was returned in, and at all relevant times was pending in, the District Court for the Southern District of California.

Macklin was indicted in the Eastern District of New York for numerous false federally insured mortgage applications (18 U.S.C. § 1010). As part of a plea bargain, Macklin entered a plea of guilty to two counts. Thereafter, it was determined that the term of the grand jury which returned the indictment had been improperly extended and that Macklin had been indicted by the grand jury after its term had expired.

Macklin then moved to withdraw his guilty plea and to dismiss the indictment. The motions were granted. The Government appealed. The order was affirmed. The Second Circuit first recognized that it was "surely anomalous that a man who has admitted his guilt should be permitted to challenge the indictment to which he has pleaded guilty" (523 F.2d at 195). The result was required, however, because the indictment was a "nullity" and "that the indictment is a nullity necessarily implies that the court was without jurisdiction to hear the case" (523 F.2d at 196). The Second Circuit concluded (523 F.2d at 196): "The absence of an indictment is a jurisdictional defect which deprives the court of its power to act. Such a jurisdictional defect cannot be waived by a defendant, even by a plea of guilty". The point of significance in *Macklin* for our purpose is that no valid indictment of Macklin was at any time pending in the Eastern District of New York and the District Court was thereby deprived of its power to act.

At the time of sentence and judgment in the case at bar, no proceeding was pending in the District of Arizona against the defendants and thus there was no proceeding in that Court in which the defendants could waive any of their rights, venue or otherwise. There was nothing over which the District Court for the District of Arizona could exercise the jurisdiction admittedly conferred by Congress on all District Courts.

The Supreme Court many years ago, in *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), used language peculiarly apt for the case at bar. Bain was indicted for a federal offense by a grand jury in the then Circuit Court for the Eastern District of Virginia. Thereafter, on motion of the Government, the Court amended the indictment by striking six words from it. Bain was tried, convicted and sentenced. An original petition for habeas corpus was made to the Supreme Court. Whether the petition could be granted depended entirely on whether the Circuit Court "had no *jurisdiction* to render the judgment which it

gave" (121 U.S. at 3, 7 S.Ct. at 782). The Supreme Court first considered the power of the Circuit Court to amend the indictment and found that there was none. The Supreme Court determined that amendment of the indictment "deprived the court of the power of proceeding to try the petitioner and sentence him . . ." because "the indictment on which he was tried was no indictment of a grand jury". (121 U.S. at 13, 7 S.Ct. at 787.) The Supreme Court then explained why this determination was required in words which to me seem equally to fit the case at bar. The indictment as returned in *Bain* was no longer pending in the court of its return because it had been changed by amendment and was "no longer the indictment of the grand jury who presented it" (121 U.S. at 13, 7 S.Ct. at 787). The indictment in the case at bar was no longer pending in the court of its return because it had been transferred to the Southern District of California. The Supreme Court said (121 U.S. at 13–14, 7 S.Ct. at 788):

> It is of no avail, under such circumstances, to say that the court still has jurisdiction of the person and of the crime; for, though it has possession of the person, and would have jurisdiction of the crime, if it were properly presented by indictment, the jurisdiction of the offense is gone, and the court has no right to proceed any further in the progress of the case for want of an indictment. If there is nothing before the court which the prisoner, in the language of the Constitution, can be "held to answer," he is then entitled to be discharged so far as the offense originally presented to the court by the indictment is concerned. The power of the court to proceed to try the prisoner is as much arrested as if the indictment had been dismissed or a *nolle prosequi* had been entered. There was nothing before the court on which it could hear evidence or pronounce sentence.

### 10.

I realize full well that (with the minor exception noted in the case of Robison) the defendants did not object to anything that was done. Nor can they show prejudice to them by anything that was done. But neither failure of the defendants to object, nor their consent, nor absence of prejudice to them is relevant on the issue of jurisdiction. This settled principle was well put in an old and unanimous opinion of the Supreme Court (*Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884)):

> It is true that the plaintiffs below, against whose objection the error was committed, do not complain of being prejudiced by it; and it seems to be an anomaly and a hardship that the party at whose instance it was committed should be permitted to derive an advantage from it; but the rule, springing from the nature and limits of the judicial power of the United States, is inflexible and without exception, which requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act. On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it. This rule was adopted in *Capron v. Van Noorden*, 2 Cranch, 126, [2 L.Ed. 229,] decided in 1804, where a judgment was reversed, on the application of the party against whom it had been rendered in the Circuit Court, for want of the allegation of his own citizenship, which he ought to have made to establish the jurisdiction which he had invoked.

### 11.

The defendants have been tried and convicted in a court having jurisdiction of the proceeding against them. I can see no rea-

son why they cannot be properly sentenced by that Court, the District Court for the Southern District of California, why appeals could not be taken to this Court from the judgments of conviction entered in the District Court for the Southern District of California, and why this Court could not then, on those appeals, reach the merits. It is fair to assume that the District Court for the District of Arizona, if advised that this Court believed it should be done, would cause all papers to be transmitted promptly to the District Court for the Southern District of California; otherwise, of course, a writ of mandamus could issue.

It may be objected that the result reached by my analysis is unnecessary and time consuming. I believe that it is necessary, although, admittedly, it does consume some time. But even if it were not essential to proceed as I would have this Court do, I believe it better that the Rules of Criminal Procedure be followed than that a precedent be established which may create confusion, uncertainty, and delay in the administration of federal criminal law.

I would reverse for want of jurisdiction the judgments of conviction of the United States District Court for the District of Arizona, and would issue a writ of mandamus under 28 U.S.C. § 1651 directing the United States District Court for the District of Arizona to vacate the judgments of conviction and to cause its Clerk forthwith to transmit all papers in the proceeding (or duplicates thereof) to the Clerk of the United States District Court for the Southern District of California, all without prejudice to the resentencing of the appellants in the United States District Court for the Southern District of California and to appeals to this Court from the judgments to be entered thereon.