79 P.3d 460 (2003)
119 Wash.App. 15
STATE of Washington, Respondent,
v.
Greg GREEN, Appellant.
No. 45177-4-I.
Court of Appeals of Washington, Division 1.
November 3, 2003.
David L. Donnan, Washington Appellate Project, Seattle, WA, for Appellant.
Lee D. Yates, King County Prosecutor's Office, Seattle, WA, for Respondent.

*461 OPINION PUBLISHED IN PART
SCHINDLER, J.
Greg Green appeals his conviction for attempted murder in the first degree. He contends that the trial court abused its discretion in admitting an immunity agreement between the State and the victim, the court erred by refusing to give a cautionary instruction regarding accomplice testimony and by giving an erroneous instruction on accomplice liability, and the prosecutor engaged in misconduct. We conclude that although the State should not have been permitted to introduce the immunity agreement in direct examination, the error was harmless. A cautionary accomplice instruction was not necessary because the testimony was substantially corroborated, the erroneous jury instruction on accomplice liability was harmless error and there was no prosecutorial misconduct. We affirm.

FACTS
On October 25, 1997, Rio Cole, a marijuana dealer, was shot and robbed. Cole testified that Greg Green and James Elliott robbed him and Green shot him.
For several years, Cole had supplied marijuana to his friends Will King and Andre Brown. During the summer prior to the shooting, Cole also supplied marijuana to their friends: Donte Perry, Wassell Grissom and Elliott.[1] Cole saw Green, Perry's cousin, at least once during that summer when he sold some marijuana to Brown. Both Brown and Cole testified that on that occasion, Green looked at Cole in a menacing manner.
On October 23, 1997, two days before Cole was shot and robbed, Perry called Cole, on behalf of Grissom and Elliott, and asked if he would sell them a pound of marijuana. Cole agreed to sell a pound for $4,000 and brought the marijuana to Perry's, Grissom's, and Elliott's apartment. Perry, Grissom, and Elliott were present during the transaction with Cole.[2]
Cole testified that two days later, on October 25, 1997, Perry called to negotiate another sale, this time for two pounds of marijuana. Cole agreed to sell Perry two pounds for $8,000. Perry and Elliott agreed to split the purchase. Perry told Cole he would send two people over to Cole's apartment with the money. Elliott testified that Perry said his cousin, Green, would bring his half of the money and go with Elliott to Cole's apartment.
That afternoon, Elliott and Green drove in a van to buy the marijuana.[3] Elliott called Cole from a payphone near the apartment complex to get further directions. Cole walked up the street and met Elliott and Green. He got in the van and directed Elliott, who was driving, to his apartment.
They arrived at Cole's apartment in Tukwila a few minutes later. Cole's girlfriend, Erika Sampson, and their two young children were also there. Cole's two-year old son was sleeping on the floor in the living room. Green and Elliott sat on the couch and Cole went to get the marijuana. When Cole returned, he placed a duffel bag containing two pounds of marijuana by Elliott's feet and sat down. The three watched a football game while Elliott examined the marijuana. Green then asked to use the restroom and Cole directed him to the bathroom down the hall. When Green returned, he was holding a gun with a laser site pointed at Cole. Cole said "I didn't know it was like this...."[4] Cole looked at Elliott, who appeared shocked, and told him to take the marijuana.
Green ordered Cole to get down on the floor. Cole got on his knees and Green told him to lie flat. Green then directed Elliott to *462 take the marijuana and leave. Elliott grabbed the duffel bag, but had difficulty opening the front door. He dropped the duffle bag, eventually opened the door, and left. Cole looked up at Green. As Green backed out of the apartment, he shot Cole. The first shot hit Cole in the mouth and face and the second hit him in the arm. Green picked up the duffel bag of marijuana and joined Elliott in the van.
Erika Sampson testified that she saw two African-American men arrive at the apartment in a van with Cole. She was in the kitchen when she heard Cole exclaim they "didn't have to do this."[5] Sampson moved towards the living room and saw Cole lying on the floor and one of the men pointing a gun at him.[6] Frightened, she backed into the kitchen. She then heard the shooter fire two shots and leave. Sampson immediately called 911. Police and medics arrived shortly thereafter. Cole was bleeding profusely from his mouth, neck, and arm. He had lost teeth and had difficulty speaking. When asked, he told the police that "two men" shot him. An ambulance took Cole to Harborview Medical Center for treatment.
Elliott testified that after leaving Cole's apartment, he drove to a house where he knew some people and got a ride from them back to the apartment he shared with Perry and Grissom. When he arrived at the apartment, several people were there, including Green and Grissom.
Grissom testified that he was taking a nap when he heard people talking loudly. As he came out of his room, Elliott said that he and Green had "hit a lick," meaning that they had robbed someone.[7] Green displayed a 9 millimeter (mm) handgun with a laser site and put it on the counter. Green said he shot Cole, but did not know if he was dead. He then put ziplock bags of marijuana on the counter.
By the following day, Green, Elliott, Grissom and Perry had all fled the state.
In a statement to the police after the shooting, Sampson said she thought the person who shot Cole was driving the van. She could not positively identify either Green or Elliott from photo montages. She could not identify who shot Cole when she testified at trial.
During their search of Cole's apartment, the police found a half-pound of marijuana and approximately $8,000 in a safe. In the living room, they recovered two shell casings and bullet fragments from a 9 mm gun.
Two days after the shooting, Tukwila police detective William Bales interviewed Cole at Harborview. Cole told him that Elliott and Green were the two men who came to purchase marijuana and Green was the one who shot him.[8] In January 1998, Cole selected and identified both Green and Elliott from photo montages.
In February 1998, the State entered into a written agreement with Cole. The State agreed not to prosecute or file charges for the drugs found in his apartment if he agreed to testify at trial.
In March 1998, the State charged Green with first degree assault. In March or April 1999, Green was arrested in California. Green admitted that he knew Cole, but said he did not know Cole had been shot. Green asked if Elliott was in custody and if Elliott had said he shot Cole.
After Green's arrest the State filed an amended information and charged Green and Elliott with first degree attempted murder. Elliott eventually turned himself in and pleaded guilty to second degree robbery. As a part of the plea agreement, Elliott agreed to testify in the trial against Green, cooperate with the police in their investigation of the case, give a statement and be interviewed about the case.
At trial, the State charged Green with first degree attempted murder and, in the alternative, first degree assault. The sole issue at trial was the identity of who shot Cole. The State relied on the testimony of Cole, Grissom *463 and Elliott to identify Green as the shooter.[9] Green argued that Cole's identification of him as the shooter was unreliable and was based on his mistaken belief that the person who shot him was the same person who purchased marijuana two days before the shooting. Green also claimed that Will King, who visited Cole at Harborview shortly after the incident, suggested that Cole name him as the shooter. Green argued that Grissom, who is physically similar to Green, was the shooter and that Elliott, Brown, King and their other friends liked Grissom but did not like Green.[10] Finally, Green introduced lyrics written by Grissom to a rap song found in the van that described a similar robbery using a gun with a laser to support his theory that Grissom shot Cole.[11]
After a month-long trial, the jury found Green guilty of attempted murder in the first degree, while armed with a firearm.[12]

Use of the Immunity Agreement
Cole entered into two separate agreements with the State to testify at Green's trial. First, in a written agreement dated February 1998 Cole agreed to appear at Green's trial and testify truthfully and to abandon any claim to the money seized at his apartment. The State agreed not to prosecute him or file drug charges based on the marijuana found in his apartment.[13]
In a subsequent plea agreement related to two pending drug charges against Cole, the State dismissed a 1999 possession charge and amended a 1998 charge to a lesser charge of possession of marijuana in exchange for Cole's agreement to testify at Green's trial. The State also agreed to recommend a sentence of sixty days confinement and 12 months of community supervision for the 1998 drug offense.[14]
Pretrial, the parties addressed the scope of examination about Cole's agreements with the State. While Green intended to ask Cole about the February 1998 immunity agreement and the favorable treatment he received with respect to the two later drug charges, he objected to the introduction of the February 1998 letter agreement as an exhibit.[15] Green's objection was two-fold. First, he claimed "the language suggests it was written for the purpose of being admitted as an exhibit in court" and secondly, that the agreement was "self-serving to the State...".[16] Green particularly objected to the part of the agreement that stated: "The intent of this agreement is to secure the true and accurate testimony of your client concerning his knowledge of the events surrounding the shooting and robbery of Rio Cole."[17] Green argued this language impermissibly vouched for Cole's credibility and improperly bolstered his testimony. Although Green objected to the admission of the agreement as an exhibit, he did not request that it be redacted.
Because Green was going to question Cole about the immunity agreement, the State insisted it was entitled to introduce the letter agreement as an exhibit during its direct examination before Cole was impeached. The State said it did not intend to focus on the "testify truthfully" language or argue that Cole was credible because he testified consistently with the agreement. The trial *464 court ruled that the February 1998 agreement was admissible as an exhibit in the State's case, particularly given the way the State intended to use it.
Green assigns error to the court's admission of the immunity agreement and argues it contains irrelevant and prejudicial provisions and language vouching for Cole's credibility. Decisions regarding the admissibility of evidence are reviewed for abuse of discretion. State v. Grant, 83 Wash.App. 98, 105, 920 P.2d 609 (1991).
In State v. Jessup, 31 Wash.App. 304, 641 P.2d 1185 (1982), this court addressed the use of immunity agreements and looked to federal precedent to determine whether the trial court erred in admitting an immunity agreement that contained prejudicial language. The challenged agreement in Jessup stated that some state witnesses were in protective custody. Jessup, 31 Wash.App. at 315, 641 P.2d 1185. The trial court denied the defendant's motion to redact the prejudicial portion of the agreement and allowed the State to admit the agreement in its entirety in its case in chief. Although this court reversed the defendant's conviction on another ground, we addressed the admission of the immunity agreement. We concluded that the agreement should not have been admitted in the State's case in chief before the witness's credibility was attacked. Evidence of agreements between the State and a testifying witness are admissible on cross examination to show bias. Jessup, 31 Wash.App. at 316, 641 P.2d 1185. If a witness is impeached, the State may introduce the agreement as an exhibit to rebut a charge of bias as "`evidence of explanation'". Jessup, 31 Wash. App. at 316, 641 P.2d 1185 (quoting United States v. Roberts, 618 F.2d 530, 535 (9th Cir.1980)). In Jessup, we said that if the agreement was introduced on redirect, the irrelevant and prejudicial portion regarding protective custody should be redacted. Jessup, 31 Wash.App. at 316, 641 P.2d 1185.
As in Jessup, the trial court erred in allowing the State to introduce the immunity agreement as an exhibit in its case before Cole's credibility was attacked.
The State argues that the admission of the immunity agreement on direct is permissible under State v. Bourgeois, 133 Wash.2d 389, 402, 945 P.2d 1120 (1997). In Bourgeois, the State was allowed to ask questions of a witness in order to "pull the sting" out of an anticipated attack in cross examination. Bourgeois, 133 Wash.2d at 402, 945 P.2d 1120.
While the rationale of Bourgeois permits the State to ask questions, it does not support the admission of the immunity agreement absent an attack on Cole's credibility. Consistent with Bourgeois, the State could ask Cole about the agreement, but was not entitled to introduce the immunity agreement as an exhibit until Cole's credibility was attacked. During cross-examination, Green used Cole's agreement with the State to impeach him. The State would have been allowed to introduce the agreement in redirect. This approach is consistent with Jessup and federal precedent and allows the State to inquire in its direct examination about the existence of an agreement and the witness's reasons for cooperating to avoid an appearance that it is attempting to conceal information from the jury. See United States v. Borello, 766 F.2d 46, 57 (2d Cir.1985).
Evidence is not admissible merely because it is contained in an agreement; references to irrelevant or prejudicial matters should be redacted. Jessup, 31 Wash.App. at 316, 641 P.2d 1185; See also Roberts, 618 F.2d at 536 ("A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful.") While the immunity agreement was admissible after Cole's credibility was attacked, we agree that the language that the intent of the agreement was to "secure the true and accurate testimony" and the provision that Cole "testify truthfully" should have been redacted if such a request had been made. These provisions were prejudicial and improperly vouched for Cole's veracity.[18]
*465 Although the immunity agreement exhibit was not admissible on direct, an error in the admission of evidence is "not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." Bourgeois, 133 Wash.2d at 403, 945 P.2d 1120.[19]
Because the agreement would have been admitted anyway, it is not within reasonable probabilities that the outcome of Green's trial was materially affected by introduction of the agreement on direct instead of during redirect. And unlike Roberts, the case relied on by Green, there was no improper argument by the State regarding the immunity agreement with Cole. In Roberts, an immunity agreement with the State's key witness was admitted into evidence and in closing argument, the prosecutor made "devastating" use of it. Roberts, 618 F.2d at 532. The State argued in Roberts that the critical issue was who was telling the truth and told the jury that its witness "would not lie for fear of violating his plea agreement." Roberts, 618 F.2d at 532. Here, the State did not rely on or argue about Cole's credibility based on the immunity agreement. Cole's memory and his ability to identify Green, rather than his credibility, were the central issues regarding his testimony. And Cole was not the State's only witness who testified that Green shot Cole. Both Elliott's and Grissom's testimony directly implicated Green as the shooter. There is not a reasonable probability that the outcome of the trial was materially affected by the error in allowing the State to admit the immunity agreement on direct.
The remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports, but will be filed in accordance with RCW 2.06.040.
WE CONCUR: KENNEDY and GROSSE, JJ., concur.
NOTES
[1] Perry is also known as "Eric Green". Grissom also goes by the name "Smiley", and Elliott goes by the name "Buster".
[2] Up until trial, Cole maintained that he sold marijuana on this occasion to Green and Elliott, rather than Grissom and Elliott. But at trial, he said he had seen Grissom in person twice after the shooting, once at the courthouse and once at a nightclub, and after seeing him, he realized that it was Grissom, not Green, who bought the pound of marijuana a couple of days before the shooting.
[3] Grissom rented the van in Portland several weeks before, and it was used communally by the group of friends.
[4] RP (6/7/99) at 124.
[5] RP (6/22/99) at 188.
[6] She said the gun appeared to be 9 mm.
[7] RP (6/16/99) at 169.
[8] He knew Elliott only as "Buster" and only knew Green's first name, Greg.
[9] Green did not testify.
[10] There was no evidence to support Green's theory that King disliked Green or had a motive to accuse him. Nor did the evidence support the theory that Green was uniformly disliked by the group of friends or that there was a conspiracy among them to falsely implicate him in the crime.
[11] At trial, Grissom admitted to writing the song, but denied it was based on his participation in the crime.
[12] He was sentenced within the standard range.
[13] Although this agreement is not in the record on appeal, it is attached as an appendix to the State's brief.
[14] At trial, the State introduced Cole's plea agreement, the State's sentence recommendation and the amended information during its direct examination of Cole. Those exhibits are not a part of the record on appeal and Green does not challenge the admission of the documents and the agreement.
[15] RP (6/7/99) at 31, 36.
[16] RP (6/7/99) at 40-41.
[17] Resp. Br. at Appendix A.
[18] On appeal, Green also challenges the admission of a portion of the agreement containing the substance of Cole's statements to the police. But while Green initially objected to this portion of agreement below, he later conceded it would be cumulative and was not prejudicial if Cole testified consistently with the statements contained in the agreement, which Cole did. RP (6/7/99) at 44.
[19] Contrary to Green's assertion, the error in allowing the State to introduce the agreement on direct is not reviewed under the constitutional harmless error standard. The case he relies on, State v. Johnson, 80 Wash.App. 337, 340-41, 908 P.2d 900 (1996), overruled on other grounds by State v. Miller, 110 Wash.App. 283, 40 P.3d 692 (2002), applies the constitutional harmless error standard to prosecutorial remarks that implicate a defendant's exercise of constitutional rights.