208 P.3d 1281 (2009)
STATE of Washington, Respondent,
v.
Nathaniel ISH, Appellant.
No. 36562-6-II.
Court of Appeals of Washington, Division 2.
June 10, 2009.
*1282 Jodi R. Backlund, Backlund & Mistry, Olympia, WA, for Appellant.
Kathleen Proctor, Melody M. Crick, Pierce County Prosecuting Attorney's Office, Tacoma, WA, for Respondent.

PART PUBLISHED OPINION
ARMSTRONG, J.
¶ 1 Nathaniel Ish appeals his conviction of second degree felony murder for the beating-death of his girlfriend, Katy Hall. He argues that (1) the trial court erred in admitting certain custodial statements he made while he was drugged, (2) the trial court violated his right to confront the witnesses against him when it limited his cross examination of a jailhouse informant, (3) the prosecutor committed misconduct by vouching for the informant's credibility, (4) the trial court erred in admitting the recorded telephone call a family member made shortly after the killing because of (a) discovery violations, (b) the hearsay rule, (c) the Privacy Act, chapter 9.73 RCW, (d) the State's failure to authenticate documents concerning the call, and (5) his attorney ineffectively represented him by proposing a jury instruction that incorrectly defined "recklessness." In a statement of additional grounds (SAG), Ish raises several additional issues. We find no reversible error and, therefore, affirm.

FACTS
¶ 2 Ish and Katy[1] met in a drug treatment program and started a romantic relationship. They left the program early to move in with Katy's elderly mother, Ilona Lynn, who was disabled. After a few months, they relapsed into using drugs.
¶ 3 One night, around 9:00 P.M., Lynn heard "bumping noises" in Katy's and Ish's bedroom.[2] Report of Proceedings (RP) (July 10, 2006) at 18. Lynn, who was in a wheel-chair, was able to partially open the bedroom door and saw Katy inside lying on the floor, drenched in blood. Lynn called Katy's children, Brittanee and Jack, who arrived within a few minutes. Brittanee yelled for her mother through the closed bedroom door, and Ish answered angrily from inside, "Look what you did. I killed her.... Come in and see." RP (May 2, 2007) at 274. When Jack entered the house, he heard banging sounds inside the room like someone hitting the walls. Jack yelled, "Nathan where is my mom?" Ish responded, "I killed her." RP (May 2, 2007) at 330-31. Jack wheeled Lynn out to the porch, and then Ish came out of the room, hit the pantry door and yelled, "I killed your mother.... She was bothering me, so I took care of business." RP (May 2, 2007) at 334.
¶ 4 Ish came out on the porch and threatened to kill Jack and his aunt and uncle, Rafaela and Michael Smith, who had arrived a few minutes earlier. Ish sat down next to Lynn, saying that God "made him do it" and stroking Lynn's hair. RP (May 3, 2007) at 474. The family members described Ish's behavior as "bizarre," "[o]ut of touch with reality," "crazy," and "radically different from anything [they] had ever seen before." RP (May 2, 2007) at 305; RP (May 3, 2007) at 481-82.
¶ 5 When the police arrived, four officers got involved in a "very chaotic" and "pretty violent struggle on the ground" with Ish while attempting to handcuff him. RP (May 3, 2007) at 412. Two officers testified that Ish had "superhuman strength" and was completely out of control. RP (May 3, 2007) at 415, 551. Ish was also saying "something about Jesus ... [but] a little incoherent," including that "[they] were all going to hell." RP (May 3, 2007) at 415. The officers twice tased Ish with little or no effect. Even after the officers handcuffed Ish, he continued to kick and fight so violently that they bound his legs at the ankles and knees and carried him to the patrol car. Ish started spitting, so they put a "spit sock" over his head. RP (May 3, 2007) at 528. He was also screaming *1283 incoherently and making "animalistic noises." RP (May 7, 2007) at 606. He stated, "I touched her blood. I touched it," RP (May 2, 2007) at 286, "Katie killed them all. Katie poisoned Ilona," RP (May 2, 2007) at 339, and "My heart is ripped out. I can feel mymy heart is bleeding." RP (May 2, 2007) at 339. During the ride to the police station, Ish stated, "Katie, look what I did. I am going to kill you. Katie, I am going to kill Jesus." RP (May 3, 2007) at 530. Then he said, "Edie, see what I did? I am going to kill you, Edie, just like that. It feels good." RP (May 3, 2007) at 530.
¶ 6 Later, police accompanied Ish in an ambulance to the hospital for treatment of his hand wounds. In the ambulance, Ish broke free of one of his leg restraints, "bucking [and] jumping wildly." RP (May 7, 2007) at 606. The police tased him again with little effect. Numerous police and medical personnel attempted to restrain Ish. But they were unable to calm him until medical staff injected him with a sedative. Ish slept for about two hours. Although the medical staff told the police that Ish had unknown amounts of cocaine, methamphetamine, and marijuana in his system, the police nonetheless questioned him when he woke up. Ish admitted that he "slapped" Katy the night before. He also remembered Katy hitting her head on a bed frame and bleeding quite a bit.

A. Procedural History

¶ 7 The State charged Ish with one count of first degree premeditated murder and one count of second degree felony murder on March 30, 2005. Ish was held in the Pierce County Jail, but the State did not arraign him because it wanted to first conduct a competency examination at Western State Hospital. The hospital found Ish competent on July 28, 2005. The trial court arraigned Ish three months later on October 20, 2005. According to the prosecutor, delays had occurred in (1) getting Ish out to Western State, (2) getting the evaluation done, and (3) conducting an independent expert evaluation the defense requested.
¶ 8 Ish's trial began on April 16, 2007, 16 months after his arraignment. Our record is incomplete. It shows March 30, 2006, more than 60 days after Ish's arraignment on October 20, 2005, as the first hearing after he was arraigned. The trial court later continued Ish's trial to July 10, 2006, but our record does not show a timely trial setting following July 10. Our record does reflect, however, that Ish appeared in court a number of times on various matters including continuances, an affidavit of prejudice, "an ongoing evaluation of the defendant and some other discovery issues," and an amended information RP (Apr. 10, 2006) at 3.

B. CrR 3.5 Motion to Exclude Custodial Statements

¶ 9 Before trial, Ish moved to suppress his statements to the police officers at the hospital, arguing that they were involuntary because he was so heavily drugged.[3] The trial court conducted a CrR 3.5 hearing on the issue.
¶ 10 Officer Jeff Martin had attended Ish while he slept off the sedative. Martin testified that when Ish awoke, he "appeared very calm, very normal" and asked Martin why he was there. RP (Apr. 16, 2007) at 17. When Martin asked him how he was feeling, Ish said he was a little bit sore and his arm hurt. Because Ish "appeared to be back to a semi[-]normal state of coherency," Martin decided to question him. RP (Apr. 16, 2007) at 18. Martin read Ish his Miranda[4] rights, which Ish said he understood and wanted to waive. Martin testified that he "had no reason to believe" that Ish did not understand what was going on; his eyes were open, and he appeared alert. RP (Apr. 16, 2007) at 20.
*1284 ¶ 11 When Martin asked Ish if he knew who Katy Hall was, he said she was his girlfriend of six months. Ish then asked, "How is she?" RP (Apr. 16, 2007) at 21. Martin asked whether Ish had been using any street drugs that night and he responded, "No, just alcohol." RP (Apr. 16, 2007) at 21. Martin described the conversation as "fairly normal"; Ish was "very calm, polite, totally opposite from what we had observed earlier in the night." RP (Apr. 16, 2007) at 21-22. Later, Ish thanked Martin for watching over him.
¶ 12 Martin called Sergeant Christopher Lawler to interview Ish. Ish slept while they waited for Lawler. Lawler and Detective Rich Hall read Ish his Miranda warnings again, and Ish again agreed to speak with them. Lawler, Hall, and Martin testified that while Ish seemed "groggy," he was coherent, calm, attentive, and alert enough to answer questions appropriately. RP (Apr. 16, 2007) at 48.
¶ 13 The trial court found that given "the quality of [Ish's] responses, the timeliness of them, the tracking, everything seems to suggest that he did understand that he was capable of making a decision to speak to the officers and doing so voluntarily, and in the process, making a knowing waiver of his rights." RP (Apr. 17, 2007) at 165. It found that Ish had voluntarily talked with the officers and denied his motion to suppress.

C. David Otterson

¶ 14 At trial, the State called David Otterson, Ish's cellmate at the Pierce County Jail. Otterson testified that Ish told him various details about Katy's death, including that he had used methamphetamine and crack that day. Ish admitted to sometimes "black[ing] out" from anger, and that on the day of the incident, "he had blacked out so bad that he was literally, felt like he was punching holes through [Katy]." RP (May 9, 2007) at 1093, 1095. But according to Otterson, Ish said that "he was going to just say he didn't remember anything at all that happened that night, just like it never happened." RP (May 9, 2007) at 1095.
¶ 15 Two issues arose regarding the details of Otterson's plea agreement with the State. First, the defense sought to cross examine Otterson about the agreement's requirement that he take a polygraph test if the State asked him to, which the State never did. Counsel wanted the jury to infer that "the State themselves don't necessarily have faith in [Otterson's] credibility." RP (Apr. 17, 2007) at 183. The trial court ruled that the prosecutor's opinion of a witness's credibility was irrelevant and inadmissible, so it required the State to redact the polygraph term from the agreement exhibit.
¶ 16 Second, the State sought to establish that in his plea agreement, Otterson promised to testify truthfully. The trial court ruled that the State could not vouch for the truth of Otterson's testimony, but that the term could be "point[ed] out" because "[o]therwise, the defense will be dangling the possibility that the State has an agreement that says, `You can lie as much as you want to. We just want you to get up there and testify.'" RP (May 9, 2007) at 1082.
¶ 17 During his cross examination, Otterson admitted that he had violated several terms of his plea agreement, including that he would reside at the same address, not use alcohol or drugs, and not commit any crimes. He also acknowledged that the State had to issue a material witness warrant to compel him to testify against Ish. On redirect examination, the State asked:
Q ... In terms of the agreement you reached with the State, ... do you know if in fact that agreement is going to be revoked or not?
A No, I don't.
Q One of the terms of your plea agreement, which [defense counsel] has gone over with you, is that you testified truthfully?
A Yes.
Q Have you testified truthfully?
A Yes, I have.
RP (May 10, 2007) at 1153.
¶ 18 During the defense attorney's closing argument, he stated that "[i]t is the desire of the State to take away from [Ish] that which we as a society hold more precious than gold or silver. It is his freedom." RP (May 21, *1285 2007) at 1437. The prosecutor responded during rebuttal:
Counsel talked to you about making a statement; that what the goal of the State is to deprive the defendant of his freedom. And that's an interesting comment because is that in fact the goal of a prosecution? Isn't the goal of a prosecution to seek justice, to seek the truth?
RP (May 21, 2007) at 1473. Defense counsel successfully objected to the last sentence, and the trial court struck it.

D. Lifeline Evidence

¶ 19 On the sixth day of trial, the prosecutor notified the trial court and the defense that Ish's statements on Lynn's porch had been recorded. Lynn subscribed to a "personal emergency response" service run by the Philips Lifeline Company and wore a "personal help button" around her neck. RP (May 16, 2007) at 1301. The night of the killing, after Jack wheeled Lynn out to the porch, she pushed the button, which sent a signal to Lifeline to open up a line of communication similar to a phone call on a speaker phone. A Lifeline employee recorded conversations with both Lynn and Ish before the police arrived. In the recording, Ish sounds relatively coherent and rational.
¶ 20 The prosecutor learned about the recording from Raphaela Smith after the trial had begun and immediately notified defense counsel. The State obtained a copy of the recording on the sixth day of trial and gave the defense a copy the next day. The State proposed to authenticate the Lifeline recording through (1) testimony by Mike Smith, who would identify each voice in the recording, (2) testimony by Mark Van Gemert, a Lifeline account and marketing manager, who would explain how the service worked and establish that Lynn was a subscriber through a Lifeline care plan agreement form printout, and (3) a case history printout from Lifeline with a description of a call on the day of the incident.[5]

1. Lifeline Plan Agreement Form
¶ 21 Ish objected to the Lifeline care plan agreement form printout, which the State offered to show that Lynn was a Lifeline subscriber. Van Gemert testified that Lifeline could not have generated the printout if Lynn had not opened an account. Ish objected because Van Gemert had testified at one point that the printout was Lynn's underlying contract, but it did not contain Lynn's signature; the only signed copy of the agreement was in a Lifeline warehouse. The trial court overruled the objection because Van Gemert's testimony was sufficient to establish that the document was what the State claimed: a record of Lynn's account with Lifeline.

2. Lifeline Recording
¶ 22 Ish also moved to exclude the recording on three grounds. First, he argued that his discovery and due process rights had been violated because even though the prosecutor had not known about the recording, the police learned of it shortly after the incident and had not immediately informed the parties. Second, he argued that the recording was hearsay and the State could not show its admissibility under the business record exception. Third, Ish argued that Lifeline violated the Privacy Act, chapter 9.73 RCW, when it recorded the conversations without his consent.
¶ 23 The trial court denied the motion. First, it ruled there was no Privacy Act violation because (1) the conversation on the porch was not private because it was "being screamed out to the world" and (2) the exception for emergency communications applied. RP (May 15, 2007) at 1264; see RCW 9.73.030(2)(a). Second, the trial court ruled that the recording was not admissible hearsay because (1) it contained Ish's own statements, (2) it was being offered to show Ish's mental or emotional state, not the truth of the statements, (3) it established the res gestae of the events as they happened, and (4) any statements by people other than Ish and offered for their truth would fall under the excited utterance hearsay exception. See ER 801(d)(2); ER 803(a)(2), (3). Finally, the trial court ruled that the State had not deprived Ish of due process because it did not *1286 have the recording before and had no duty to acquire it. The trial court also concluded that the State had produced enough evidence to authenticate the recording despite defense counsel's suggestion that it could have been altered. The State played the recording to the jury.

E. Jury Instructions

¶ 24 Defense counsel proposed a jury instruction defining recklessness based on 11 Washington Practice: Washington Pattern Jury Instructions: Criminal (WPIC) 10.03, at 153 (2d ed.1994):
A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and the disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.
Recklessness also is established if a person acts intentionally or knowingly.
Clerk's Papers at 109 (emphasis added). The trial court gave the instruction without objection from either party.
¶ 25 The jury convicted Ish of (1) first degree manslaughter on Count One and (2) second degree felony murder on Count Two. The trial court entered judgment only on Count Two, vacating the first degree manslaughter conviction. It calculated an offender score of three based on three out-of-state felonies without objection from either party, it then imposed a prison sentence at the high end of the standard sentencing range, 254 months. The trial court also imposed 24-48 months of community custody.

ANALYSIS

I. VOUCHING FOR OTTERSON'S CREDIBILITY
¶ 26 Ish argues that the prosecutor improperly vouched for Otterson's credibility when she elicited that his plea agreement (1) required him to testify truthfully and (2) could be revoked if he breached it. He also argues that the prosecutor compounded the problem by telling the jury during closing argument that the prosecution's goal was "to seek justice" and "to seek the truth." RP (May 21, 2007) at 1473. To prevail on a claim of prosecutorial misconduct, a defendant must show that the claimed improper conduct prejudiced him. State v. Weber, 159 Wash.2d 252, 270, 149 P.3d 646 (2006), cert. denied, ___ U.S. ___, 127 S.Ct. 2986, 168 L.Ed.2d 714 (2007).
¶ 27 Ish relies on United States v. Roberts, 618 F.2d 530, 536 (9th Cir.1980), which articulated a "strong case ... for excluding a plea agreement promise of truthfulness":
The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.
¶ 28 But the quoted language is dicta because the court was merely giving "guidance" to the trial court on remand.[6]Roberts, 618 F.2d at 535. Nevertheless, Division One appears to have adopted the Roberts dicta in State v. Green, 119 Wash.App. 15, 24, 79 P.3d 460 (2003). In Green, the witness testified under an immunity agreement that required the witness to "testify truthfully" with the stated purpose of "secur[ing] the true and accurate testimony" of the witness. Green, 119 Wash.App. at 24, 79 P.3d 460. The prosecutor did not call attention to either provision during questioning or in his closing *1287 argument, but he offered the entire agreement as an exhibit without redactions. Green, 119 Wash.App. at 22, 79 P.3d 460. Division One held that the trial court should have redacted the two truthfulness provisions from the agreement because they were "prejudicial and improperly vouched for [the witness's] veracity." Green, 119 Wash.App. at 24, 79 P.3d 460.
¶ 29 We decline to follow Green or the dicta in Roberts. While it is improper for a prosecutor to vouch for the credibility of a witness, no prejudicial error arises unless counsel clearly and unmistakably expresses a personal opinion as opposed to arguing an inference from the evidence. State v. Warren, 165 Wash.2d 17, 30, 195 P.3d 940, 946 (2008) (citing State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995)), cert. denied, ___ U.S. ___, 129 S.Ct. 2007, ___ L.Ed.2d ___ (2009). No such opinion was apparent here.
¶ 30 The circumstances here are similar to those in State v. Kirkman, 159 Wash.2d 918, 925, 155 P.3d 125 (2007), a child rape case where a detective testified that before he interviewed the victim, he elicited the victim's promise to tell the truth. On appeal, the defendant argued that the officer had vouched for the victim's credibility. Although the issue in Kirkman was whether the testimony amounted to manifest error of constitutional magnitude, the court's analysis is helpful because it focused on whether the testimony was error at all, not the possible level of harm: "[the detective's] testimony is simply an account of the interview protocol he used to obtain [the victim's] statement." Kirkman, 159 Wash.2d at 931, 155 P.3d 125. Thus, the testimony "`merely provided the necessary context that enabled the jury to assess the reasonableness of the ... responses.'" Kirkman, 159 Wash.2d at 931, 155 P.3d 125 (quoting State v. Demery, 144 Wash.2d 753, 764, 30 P.3d 1278 (2001)). Similarly here, the testimony that Otterson's plea agreement required him to testify truthfully merely set the context for the jury to evaluate his testimony. The trial court did not abuse its discretion in admitting that evidence.
¶ 31 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: BRIDGEWATER, J., and PENOYAR, A.C.J.
NOTES
[1] Because several people in this case have the last name "Hall," we refer to Katy Hall and her family by their first names.
[2] Lynn testified by video deposition because she passed away before trial.
[3] At the time, the identity and specific effects of the "sedative" that had been used were unknown. Later at trial, however, the emergency room physician, Dr. Stephen Friedrick, testified that the drug was Haloperidol, or Haldol, an antipsychotic drug that acts as a "strong sedative." RP (May 16, 2007) at 1347. He also testified that he gave Ish double the normal amount, but that Haldol does not alter a person's sense of reality.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] This printout was ultimately excluded from trial under the hearsay rule.
[6] The reversible error in Roberts was more than merely mentioning the witness's duty to testify truthfully under the plea agreement. During closing argument, after emphasizing the consequences that the witness would suffer if he breached the agreement by lying, the prosecutor stated that the detective on the case had been sitting in the courtroom during the witness's testimony, clearly suggesting that his purpose was to monitor the testimony and assure that the witness was in fact testifying truthfully. Roberts, 618 F.2d at 533-34. The Ninth Circuit held that the prosecutor had vouched for the witness's credibility by improperly referring to facts outside the evidence. Roberts, 618 F.2d at 533-34. Specifically, with the monitoring argument, the prosecutor intended the jury to believe that the detective (1) had personal knowledge of relevant facts and (2) was satisfied that the witness had testified to them accurately. Roberts, 618 F.2d at 534.