Filed 6/17/14  P. v. Herrera CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GERSON HERRERA,<br><br>    Defendant and Appellant. | B250703<br><br>(Los Angeles County Super. Ct.<br> No. LA065186) |

APPEAL from a judgment of the Superior Court of Los Angeles, Michael K. Kellogg, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Law Offices of Edward J. Haggerty and Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Peggy Z. Huang, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Gerson Herrera[1] of first degree murder. (Pen. Code, § 187, subd. (a).)[2] The jury found true the allegations that defendant personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(d)), and that a principal was armed with a firearm (§ 12022, subds. (a)(1)). Defendant waived his right to a jury on the prior conviction allegations and the trial court found true the allegations that defendant suffered a prior strike within the meaning of the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), suffered a prior serious felony conviction (§ 667, subd. (a)(1)), and had served a prior prison term (§667.5, subd. (b)).

The trial court sentenced defendant to 75 years-to-life in state prison, consisting of a term of 25 years-to-life for first degree murder, which it doubled to 50 years-to-life pursuant to the three strikes law, plus 25 years-to-life for the personal firearm enhancement. The court imposed and stayed the sentence for the prior serious felony conviction under section 667, subdivision (a).

Defendant contends that the trial court improperly instructed the jury on the consideration of accomplice testimony. He further contends that the prosecutor committed misconduct during closing argument by misstating the law defining first degree murder, and defense counsel rendered ineffective assistance of counsel by failing to object to the argument. Lastly, he asserts that the prosecutor also committed misconduct by improperly vouching for the credibility of witnesses during rebuttal argument.

We hold that the trial court erred by staying the five-year enhancement under section 667, subdivision (a)(1), because imposition of the enhancement is mandatory.

---

[1] Defendant and codefendants Ian Hamilton, Gary Mikaelian, and Joaquin Ramos were jointly charged with murder. (Pen. Code, § 187, subd. (a).) Hamilton was tried separately. A jury found Hamilton guilty of first degree murder and found true the special allegation that a principle was armed with a firearm. He was sentenced to 26 years-to-life in state prison. Mikaelian pled guilty to attempted murder and manslaughter. Mikaelian was sentenced to eight years and four months in state prison. Ramos also reached a disposition on his case.

[2] All further statutory references are to the Penal Code unless otherwise specified.

We remand the cause to the trial court with directions to impose the enhancement, and in all other respects, we affirm.

## FACTS[3]

**Planning of the Murder and Prior Attempts**

Ian Hamilton had a child with Anel Juarez. They were engaged in an ongoing custody battle over the child, which angered Hamilton.

Angelo Nieto[4] knew both defendant and Joaquin Ramos from school and from living in the same neighborhood. Nieto and Hamilton worked together as mall security guards before Nieto left to work at another mall. Hamilton was Nieto's supervisor. Hamilton and Mikaelian were also coworkers; Mikaelian was Hamilton's supervisor.

Hamilton told Nieto and Mikaelian about the problems he was having with Juarez regarding their child. Hamilton initially offered Nieto $300 to "fuck [Juarez] up." Nieto refused, but said he knew someone who would do it and discussed it with his friends Efren and Fabian. In exchange, Nieto would pay Efren with marijuana and forgive the debt that Fabian owed. Hamilton paid Nieto $300 and instructed Nieto, Efren, and Fabian to go to a laundromat near Hamilton's house to hurt Juarez. There were too many people at the laundromat, so the plan was called off.

There was a second attempt to hurt Juarez at her sister's house. Under that plan, Efren's friend would beat Juarez and they would take her money. Nieto, Efren, and Efren's friend went to the sister's house and waited for Juarez, but no one showed up. Later, defendant, Nieto, and Fabian returned to the sister's house in another unsuccessful attempt to beat Juarez.

---

[3] Defendant did not testify and called no witnesses at trial.

[4] Nieto pled guilty to manslaughter and attempted murder. He was sentenced to 13 years and 4 months in state prison in exchange for his testimony.

After the failed attempts, Hamilton decided that he wanted Juarez killed. Hamilton and Nieto had discussions about killing her, but there was no established date or time. However, Nieto knew that it was time to execute the plan when Hamilton called him one day. Nieto then asked defendant to kill Juarez. Since Hamilton and defendant did not know each other, Nieto introduced them. Defendant asked how many shots he should fire at Juarez because he might "get trigger-happy." Hamilton said that he did not care and "just to empty the whole [magazine]."

During this time, Nieto was having some problems with a neighbor so Hamilton lent him a .45-caliber gun. Nieto showed the handgun to defendant and Ramos. When Nieto returned the gun to Hamilton, Nieto told him that defendant liked the gun. Hamilton stated defendant could have the gun. Nieto then told defendant he could keep the gun, and Nieto would give him crystal methamphetamine on the condition that defendant would kill Juarez. Defendant agreed to the deal.

Nieto and defendant made their first attempt to kill Juarez after she moved to a different apartment. Nieto called Hamilton, who told him that Mikaelian would be meeting them at the gas station. This was the first time Nieto knew of Mikaelian's involvement. When Mikaelian showed up, Nieto followed Mikaelian by car to Juarez's apartment where defendant and Nieto waited for Hamilton. Eventually Hamilton came out of the apartment building. Nieto saw defendant holding a gun. The plan was that defendant would shoot Juarez when she came out of the building. However, Juarez never came out so Nieto and defendant left.

Hamilton would call Nieto several times later and direct him to execute the plan to kill Juarez, however, each attempt was shortly abandoned.

Later, Hamilton called and sent text messages to Nieto asking that defendant return the gun to him because Hamilton needed it, but defendant refused. Nieto told defendant to return the gun and that he could have it back later. Near the time of the murder, Hamilton gave Nieto a Beretta handgun. Nieto asked Ramos to hold the gun for him.

On April 12, 2010, one day before Juarez was murdered, Hamilton met Nieto and defendant at Whitsett Park. They decided to bring Juarez to a location across from the park where there would not be a lot of people. Hamilton planned to lure Juarez to the park under the pretense that he had a job for her as a stripper.

**The Murder**

On April 13, 2010, between 7:00-7:30 p.m., Hamilton called Mikaelian and asked him to come to work at the mall because he needed money to buy gas for the truck. When he arrived at work, Mikaelian gave Hamilton some money. Although Hamilton was supposed to work, Mikaelian drove Hamilton to Nieto's apartment. Nieto was not home, so Hamilton and Mikaelian left to Juarez's apartment.

Nieto was at work at around 8:30 p.m., when he received a phone call from Hamilton who ordered Nieto to "[g]o look for your homie," a reference to defendant. Nieto knew it was time to try again to kill Juarez and called defendant, but he did not answer the phone. Nieto returned home to change his clothes and went to defendant's house.

When Nieto arrived at defendant's house, defendant told him that Hamilton had just left that location. Defendant showed Nieto a box of bullets and a gun given to him by Hamilton. Nieto recognized the .45-caliber gun because Hamilton had allowed him to fire it.

Nieto had planned to drive defendant in his car to the park, but he changed his mind so he asked defendant to find another driver. Nieto offered his car to defendant and left his house. Nieto knew that the murder of Juarez would happen after he left. Since defendant did not find another driver, Hamilton called Nieto and told him to return to defendant's house. Ramos was at the house when Nieto returned. Ramos told Nieto that he had to be the driver because he had recruited defendant to commit the murder. Ramos said he left his van's window open so that defendant could leave the gun inside the van after the murder.

5

Around 8:40 or 9:00 p.m., Hamilton and Mikaelian arrived at Juarez's apartment. Hamilton told Mikaelian to drive to Rhodes Avenue near the park and wait for him. Mikaelian followed Hamilton's direction.

Saida Navarrete lived in an apartment on the first floor of the apartment building where Juarez resided on April 13, 2010. At around 9:00 p.m., Navarrete and her husband were walking out of the apartment complex when she saw Juarez walking down the stairs from her apartment with Hamilton. Hamilton was wearing tennis shoes, blue jeans, and a gray sweatshirt with a hood. Navarrete had seen Hamilton come to the apartment complex on two occasions. Juarez appeared to be intoxicated or under the influence of drugs. Hamilton was holding Juarez as she was swaying from side to side as she walked. At the bottom of the stairs, Juarez said, "Hello, ma'am. How are you?" Navarrete responded, "Fine. Thank you." Hamilton was silent and did not make eye contact. His demeanor was "strange" and he held Juarez in a manner "as if not to talk to anybody." After Juarez and Navarrete greeted each other, Hamilton made an abrupt turn and took Juarez away so that she could not continue to speak to Navarrete.

Hamilton called Nieto and told him that he and Juarez were on their way. Nieto drove defendant to the park. Defendant had a .45-caliber handgun with him. He was wearing a sweater with checkered shorts that fell below the knee. Hamilton drove Juarez's car past Mikaelian and parked next to the park. Juarez was in the passenger seat. Nieto saw Hamilton arrive and asked defendant if he would kill Juarez. Defendant said that he did not want to because he did not want to get caught. Hamilton and Juarez were in the car for five minutes before Hamilton exited the car. Hamilton walked over to Mikaelian in his car and said, "Let's go." Mikaelian asked where they were going and Hamilton said to go back to work. They left Juarez on Rhodes Avenue. Defendant chambered a round into the gun, exited Nieto's car, and walked toward Juarez's car. A couple of minutes later, defendant returned. Nieto asked defendant what had happened and defendant said that there were a lot of people watching him.

While Mikaelian and Hamilton were driving away from Rhodes Avenue, Nieto relayed what happened to Hamilton. Hamilton responded that the killing had to happen

6

that day.  After Hamilton hung up the phone, he asked Mikaelian to return to Rhodes Avenue where they had left Juarez.  Mikaelian returned to the same spot where he had parked earlier.  Hamilton exited the car and walked over to Juarez.  A minute later, Hamilton returned to Mikaelian' s car and told him to follow Juarez's car.  Hamilton walked back to Juarez's car and got in.

Nieto's car drove past Mikaelian with defendant in the passenger seat, followed by Juarez's car.  Juarez was driving this time and Hamilton was in the passenger seat.  Nieto stopped the car in the middle of Archwood Street.  Defendant exited the car and walked toward Juarez's car, but returned because there were too many people.  Nieto called Hamilton again and told him that there were too many people around.  Hamilton said that he was returning to the park area and that the murder had to be done that day.  He also said to block Juarez if she tried to leave.

Nieto drove back to Rhodes Avenue, where he and defendant waited in the car.  Nieto saw Juarez's car make a U-turn.  Hamilton called Nieto and told Nieto that he would follow him to another place.  As Nieto drove down Rhodes Avenue, he saw Mikaelian's car, which then followed Nieto's car.  Nieto drove to a nearby location on Gault Street, which was a dead end street.  Nieto made a U-turn and parked on St. Clare Street.  Juarez's car also drove down Gault Street and parked.  Hamilton stuck his arm out of Juarez's car window and pointed to Mikaelian to park on the corner of Gault and St. Clare Street.  Hamilton called Nieto and asked, "Where is your homie at?"  Nieto responded, "Right here."  Hamilton told Nieto to tell defendant to "go over there."  Hamilton was standing outside of Juarez's car when defendant exited Nieto's car with the gun in hand.  Hamilton walked to the corner of Gault and St. Clare Street as defendant walked past him.  Both Nieto and Mikaelian heard rapidly fired gunshots.  Hamilton ran to Mikaelian's car and defendant ran to Nieto's car.  Both cars drove away.

Aleen Haroian, who lived on Gault Street, was at home on April 13, 2010, at 10:00 p.m. when she heard her dog barking aggressively and continuously along the side of her house.  The dog's behavior caused Haroian to believe that there was something unusual happening outside.  She went outside and saw a man she had never seen before

7

pacing back and forth on the sidewalk in front of her home. The man was wearing baggie shorts with stripes below his knees and a dark hoodie, but she was unable to see the man's face. A car that Haroian did not recognize was parked across the street from the house. The man placed his hand on his right pocket. Haroian returned to her house. She heard two gunshots that sounded as if they came from the front of the house. Haroian called 9-1-1.

When Hamilton returned to the car, Mikaelian asked what had happened, but Hamilton said, "Nothing," and that they would discuss it later. As Mikaelian started to leave the area, Nieto's car drove by. While Mikaelian was driving, Hamilton received phone calls. Mikaelian dropped Hamilton off at the mall around 10:30 p.m.

Nieto slowly drove away so that no one would see a car leaving. When defendant entered Nieto's car, he had a "burnt" smell similar to what Nieto recalled after he had fired the same .45-caliber handgun. Nieto drove to Ramos's apartment where Ramos had parked the van. Defendant exited the car and dropped the gun through the van's window. He returned to the car and Nieto drove away. Nieto and defendant did not talk to each other in the car. He dropped defendant off at his house and Nieto went home. Juarez died as a result of multiple gunshot wounds.

The morning after the shooting, Nieto went to defendant's house, where Ramos was present. Defendant was cleaning the .45-caliber handgun used in the shooting. Ramos told Nieto not to talk about the murder. After Ramos left, defendant told Nieto what had happened the night before. Defendant stated that he walked up to Juarez's car and Juarez asked him if he was Hamilton's "homie." Defendant shook his head to indicate "no," and then he shot Juarez. Juarez had a surprised look and let out a gasp when defendant displayed the gun.

**Additional Evidence**

Three .45-caliber casings were found at the scene of the shooting of Juarez. While in custody after his arrest, defendant told Mikaelian that he had walked up to Juarez and

8

fired the gun three times. A restraining order against Hamilton was found inside Juarez's car, along with information on multiple phone numbers. Investigation of those numbers showed contacts between defendant, Hamilton, Ramos, Mikaelian, and Nieto in the time period leading up to the murder. Defendant admitted to police that he was nearby when Juarez was shot, but said Hamilton was the shooter.

## DISCUSSION

### Jury Instructions

Defendant contends the trial court erred by giving inconsistent and confusing instructions when it provided the jury with CALJIC No. 3.16 ("Witness Accomplice as a Matter of Law") in conjunction with CALJIC No. 3.19 ("Burden to Prove Corroborating Witness Is an Accomplice"). These instructions, according to defendant, inconsistently told the jurors that (1) Nieto and Mikaelian were accomplices as a matter of law and (2) defendant had the burden of proving these witnesses were accomplices. Defendant further contends that the trial court failed to sua sponte instruct the jury with CALJIC No. 3.18 ("Testimony of Accomplice or Codefendant to be Viewed With Care and Caution").

#### Standard of Review

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "'"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.)

9

"Error in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.)" (*People v. Williams* (2010) 49 Cal.4th 405, 456.) "Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone is harmless if there is evidence corroborating the accomplice's testimony." (*Ibid.*)

**Forfeiture**

Preliminarily, we reject the Attorney General's contention that defendant forfeited his claim by failing to object to the jury instructions, to the extent defendant contends the instruction error implicated his substantial rights. (§ 1259; *People v. Franco* (2009) 180 Cal.App.4th 713, 719 [failure to object to an instruction in the trial court waives any claim of error unless "the instruction was an incorrect statement of the law [citation], or . . . the instructional error affected the defendant's substantial rights"].) Although we decline to resolve the issue on the ground of forfeiture, we nonetheless hold defendant fails to establish prejudicial error.

**CALJIC Nos. 3.16 and 3.19**

During the discussion of jury instructions, the prosecutor informed the trial court that CALJIC No. 3.16 was not included in the instructions. Defense counsel agreed that CALJIC No. 3.16 should be given. The court agreed and included it as modified. At the conclusion of the discussion, the court asked both counsel if there was anything further to discuss and defense counsel responded, "No. That's it, your honor."

The jury was instructed with a modified version of CALJIC No. 3.16 as follows: "If the crime of Murder was committed by anyone, witnesses Angel Nieto, and Gary Mikaelian, were accomplices as a matter of law and their testimony is subject to the rule

10

requiring corroboration." Then the jury was instructed with a modified version of CALJIC No. 3.19 as follows: "You must determine whether the witnesses Angel Nieto, and Gary Mikaelian was an accomplice [sic] as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Angel Nieto and Gary Mikaelian were accomplices in the crimes charged against the defendant."

We agree with defendant that the trial court should not have given CALJIC No. 3.19, but the error could not have been prejudicial in this case. The parties agreed at trial, and again agree on appeal, that Nieto and Mikaelian were accomplices. The jury was instructed that an accomplice is a person subject to prosecution for the identical offense charged in the case pursuant to CALJIC No. 3.10, the jurors knew that both Nieto and Mikaelian had pled guilty in connection with this case, and the prosecutor conceded in closing arguments that Nieto and Mikaelian were accomplices. CALJIC No. 3.19 was mere surplusage that had no application to the facts. (See CALJIC No. 17.31 [jury should disregard instructions that do not apply to the facts].)

Moreover, the requirement that the testimony of an accomplice be corroborated was thoroughly explained to the jury in CALJIC No. 3.11 ("Testimony of Accomplice or Codefendant Must Be Corroborated"), CALJIC No. 3.12 ("Sufficiency of Evidence to Corroborate an Accomplice"), and CALJIC No. 3.13 ("One Accomplice May Not Corroborate Another"). The record on appeal contains abundant corroboration of the accomplices' testimony. Hamilton had a strong motive to kill Juarez, with whom he had an ongoing dispute over custody of their son. The manner in which the killing took place was consistent with a planned execution, as described in the accomplices' testimony. Cell phone records corroborated defendant's connection to Hamilton and placed them in the vicinity of the shooting. The clothing worn by defendant at the time of the shooting was described by both Haroian and Nieto. The number of casings found at the scene of the murder was consistent with the number of shots defendant told Mikaelian he had fired at Juarez. Given these facts, and other sources of corroboration, defendant has fallen far short of demonstrating reversible error.

11

**CALJIC No. 3.18**

Defendant further contends that the trial court had a sua sponte duty to instruct the jury with CALJIC No. 3.18. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 (*Guiuan*).) CALJIC No. 3.18 provides as follows: "To the extent that [an accomplice] [or] [a codefendant] gives testimony that tends to incriminate [the] . . . defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case."

The failure to sua sponte instruct the jury with CALJIC No 3.18 was clearly harmless in this case. The jury was thoroughly instructed on the requirement of corroboration for accomplice testimony. (See CALJIC Nos. 3.11, 3.12, 3.13.) "'At common law the fact that a witness was an accomplice resulted only in an instruction that his testimony was to be viewed with care, caution, and suspicion unless corroborated in any material matter by independent evidence. [Citations.] The limitation based on the common law distrust of accomplices as now embodied in [Penal Code] section 1111 [barring convictions based on uncorroborated accomplice testimony] is much harsher than the common law limitation. Juries are now compelled rather than cautioned to view an accomplice's testimony with distrust, for while his testimony is always admissible and in some respects competent to establish certain facts (see *People v. McRae* [(1947)] 31 Cal.2d 184, 187 [probable cause to hold defendant to answer at preliminary hearing]), such testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated.' [Citation.]" (*Guiuan*, *supra*, 18 Cal.4th at pp. 573-574.) Here, the corroboration instructions effectively subjected Nieto's and Mikaelian's testimony to a harsher standard than an instruction to view their testimony "with caution," as it required the jury to examine whether their testimony was at least partly confirmed by independent evidence.

In addition to the corroboration instructions, the jury was instructed pursuant to CALJIC No. 2.20 on witness credibility to consider, among other things, the existence of

12

"bias, interest, or other motive" in weighing the credibility of a witness (see Evid. Code, § 780), and with CALJIC No. 2.21.2 that "A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others." "To the extent defendant argues the jury should have been instructed to view Pridgon's testimony with distrust (CALJIC No. 3.18), we find the other instructions given — including '[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others' (CALJIC No. 2.21.2), along with instructions on a witness's credibility (CALJIC No. 2.20) and the character of a witness for honesty or truthfulness or their opposites (CALJIC No. 2.24) — were sufficient to inform the jury to view Pridgon's testimony with care and caution, in line with CALJIC No. 3.18." (*People v. Lewis* (2001) 26 Cal.4th 334, 371.) "[W]e have no doubt that the jurors viewed [the] testimony [of Nieto and Mikaelian] with extreme caution." (*People v. Jones* (2003) 30 Cal.4th 1084, 1113.)

## Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct by understating the legal requirements of premeditation and deliberation during closing argument. He also argues misconduct was committed when the prosecutor vouched for the credibility of witnesses during rebuttal argument.

### Misstating the Law

During closing arguments, the prosecutor stated: "Deliberation, premeditation is something we do anywhere from waking up in the morning to deciding which shoes to wear or if the light turns to yellow, do I keep driving or not? You're deciding. [¶] Is this something I am going to choose to do it after you think it through? No amount of time is necessary. Could be a split-second decision or something such as in this case, planned out long before." Defendant contends it was misconduct to analogize premeditation and

deliberation to selecting a pair of shoes or a driver's decision to enter an intersection after the traffic light turned yellow. Defendant maintains entering an intersection or selecting a pair of shoes is an inconsequential decision made hastily or impulsively rather than after true deliberation or planning activity.

Defendant failed to object on the ground of prosecutorial misconduct and failed to request a jury admonition with respect to the prosecutor's comments. Defendant therefore forfeited the prosecutorial misconduct issue. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679-680; *People v. Riggs* (2008) 44 Cal.4th 248, 298.)

Defendant's alternative argument that the issue is cognizable on appeal because trial counsel rendered ineffective assistance by failing to object below is without merit. "Failure to object rarely constitutes constitutionally ineffective legal representation." (*People v. Boyette* [(2002)] 29 Cal.4th [381,] 424.)" (*People v. Gray* (2005) 37 Cal.4th 168, 207.) In addition, the record on appeal does not contain a reason for counsel's failure to object, so the issue is not properly presented on direct appeal. (*Ibid.*) Finally, because we conclude below that there was no prosecutorial misconduct, counsel's failure to object therefore could not constitute ineffective assistance of trial counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

The contention also fails on the merits. We resolve this issue based on familiar principles. """"A prosecutor's intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so 'egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" [Citation.]" [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) """"A prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.'""" (*Ibid.*) To prevail on a claim of prosecutorial misconduct based on comments to a jury, the defendant must show a reasonable likelihood the jury understood

14

or applied the challenged comments in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Viewing the challenged comments in context, the jury would have reasonably understood the point made by the prosecutor is that premeditation and deliberation can occur quickly. The prosecutor's statement was consistent with CALJIC No. 8.20 which states that the test for premeditation and deliberation is not the duration of time, but rather the extent of the reflection. (*People v. Bolin* (1998) 18 Cal.4th 297, 332.)[5] "The prosecutor did not misstate the law of premeditation and deliberation." (*People v. Osband* (1996) 13 Cal.4th 622, 697 [rejecting claim of prosecutorial misconduct based on arguments that premeditation means "considered beforehand" and restating the law that premeditation and deliberation can occur in a brief interval].)

Finally, the prosecutor's statement could not have been prejudicial. The jury was properly instructed on the definition of premeditation and deliberation, and that the jury must follow the court's instructions if they conflict with anything said by the attorneys during argument. (CALJIC No. 1.00.) In the context of a murder for hire, which included several aborted attacks on the victim, there is no likelihood that the prosecutor's brief argument on this point swayed the jury to find that the murder was committed with premeditation and deliberation.

**Vouching for Witnesses**

Defendant contends the prosecutor improperly vouched for the credibility of his witnesses during rebuttal argument by invoking the integrity of the district attorney's office and implying that their testimony had been vetted by multiple layers of the prosecutorial bureaucracy.

---

[5] *People v. Johnson* (2004) 119 Cal.App.4th 976 and *People v. Nguyen* (1995) 40 Cal.App.4th 28, cited by defendant, do not compel a contrary conclusion, since both cases dealt with the reasonable doubt standard rather than the element of premeditation and deliberation.

A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. (*People v. Sully* (1991) 53 Cal.3d 1195, 1235; *People v. Anderson* (1990) 52 Cal.3d 453, 479.) "Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial." (*People v. Frye, supra,* 18 Cal.4th at p. 971, citing *United States v. Roberts* (9th Cir. 1980) 618 F.2d 530, 536–537.) However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," his comments cannot be characterized as improper vouching. (*People v. Medina* (1995) 11 Cal.4th 694, 757; see also *People v. Williams* (1997) 16 Cal.4th 153, 256.)

In his argument to the jury, defense counsel stated, "[The prosecutors] end up giving [Nieto] all of his statements. They give him all of his police reports. The guy is as versed on this case as anybody. And finally he does get that deal after volumes and volumes of transcripts." Counsel further argued that "[the prosecution] threw a Hail Mary pass on the day before the trial, started back in 2010. They threw a Hail Mary pass the day before trial. When they gave those deals, Hail Marys." Counsel continued by stating, "[j]ustice shouldn't be for sale. And in this case justice was for sale, and people took advantage of it." He argued that "[t]hey sold the district attorney a bill of goods. The district attorney bought it, because they want to get [defendant]. Counsel told the jury, "the other guys changed their stories because they got paid for it. They got something for it. [Defendant] didn't." Counsel also argued, "And finally, justice was sold. You can't convict him on that."

In his rebuttal argument, the prosecutor stated: "So what we hear yesterday was the defense of deception. 'Justice was brought' was the phrase used several times. Were they paid anything? Of course not. But what did they do? They were given an opportunity to talk with us and tell us the truth in exchange for truthful testimony. [¶] Now the way it was presented is that somehow the prosecutor is involved, and there were

multiple prosecutors. You heard some other names. The prosecutors involved somehow created some sort of manipulation to get these people to come and lie, that we were part of some sort of conspiracy, if you will — we have been talking a lot about those — to get people to come and lie on our behalf because for some reason, we really want these other guys. [¶] Now on behalf of Jackie Lacey, about a thousand prosecutors in the county of Los Angeles, the largest district attorney's in the country, I was offended. Offended. [¶] Where has there been any evidence presented that anything improper was done by my office? [¶] Now it would be unethical for me to do certain things, such as describe to you how our office works or try to persuade you because this is how our office works. [¶] To call one of the top 15 people in our office to take the stand during the trial to explain to you how we have a large bureaucracy and they are involved in a case of this nature and that things happen at certain times because there's about a thousand attorneys working and has to filter up to about the top of that pyramid, and they're involved in making decisions. Does that mean somehow Miss Tanner, myself, or any of our other colleagues did something?"

We conclude that the "prosecutor's comments were fair rebuttal to defense counsel's characterization of the prosecution evidence . . . ." (*People v. Edwards* (2013) 57 Cal.4th 658, 740.) "[E]ven otherwise prejudicial prosecutorial argument[s], when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct." (*People v. McDaniel* (1976) 16 Cal.3d 156, 177.) Throughout his closing argument, defense counsel asserts improprieties by the district attorney's office and that justice was sold in this case. The rebuttal argument was an appropriate response to defense counsel's argument which impugned the integrity of the prosecution.

We further conclude defendant cannot establish prejudice from the prosecutor's argument. The subject comments were brief and relatively isolated, particularly as compared to defense counsel's comments maligning the prosecution. Additionally, the prosecutor finished discussing the topic by directing the jury to decide the case on the evidence presented, stating, "[Y]ou had no idea what it took to get those witnesses on the stand, you don't. They got there and they testified. Evaluate them for what they said.

17

The credibility of your analysis is not based upon what happened out of court with our offices. [¶] Your credibility of your analysis should be what you saw from the stand and based on the things you heard as far as evidence, not what my office did."

The prosecutor's request that the jury focus on the facts of the case in its evaluation of the witnesses' credibility, in combination with the court's instructions that jurors must determine the facts solely from the evidence received at trial and that statements made by the attorneys during trial are not evidence, sufficiently dissipated any potential harm the remark might otherwise have caused. As a result, there is no "reasonable likelihood that the jury construed or applied . . . the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072, 1076 overruled on another point in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

Under the circumstances, we conclude that prosecutor's statements during rebuttal "did not render the trial fundamentally unfair. Nor did it amount to a deceptive or reprehensible method of persuasion. Accordingly, it did not constitute misconduct under federal or state standards. [Citations.]" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1218-1219.)


**Prior Conviction under Section 667, Subdivision (a)**


The trial court stayed imposition of the section 667, subdivision (a) enhancement of five years. The Attorney General contends the court lacked the power to stay the enhancement, and the cause must be remanded to the trial court to either stay or impose the additional five-year term. The Attorney General is correct that the enhancement cannot be stayed, but errs in stating it can be stricken, as such action is expressly forbidden by statute. (§ § 667, subd. (a) ["In compliance with subdivision (b) of section 1385, any person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive . . . a five-year enhancement . . . [and the] terms of the present offense and each enhancement shall run consecutively"]; 1385, subd. (b) ["This

18

section does not authorize a judge to strike any prior conviction of a serious felony for purposes of sentence under section 667"].)  Upon remand, the trial court shall impose the mandatory five-year enhancement under section 667, subdivision (a).

## DISPOSITION

The cause is remanded to the trial court with directions to impose the five-year enhancement under Penal Code section 667, subdivision (a)(1).  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


MINK. J. *

---

* Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.